620 So.2d 421 (1993)
Jennie P. CROOKS, et vir., Plaintiff-Appellant,
v.
NATIONAL UNION FIRE INSURANCE CO., et al., Defendants-Appellees.
No. 92-1053.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1993.
Rehearings Denied July 13, 1993.
*423 William M. Ford, Howard N. Nugent, Jr., Alexandria, for Jennie P. Crooks, et vir.
James Dey Kirk, Westlake, for National Union Fire Ins. Co., et al.
Before DOMENGEAUX, C.J., and YELVERTON and SAUNDERS, JJ.
SAUNDERS, Judge.
In this personal injury suit, plaintiffs, Jennie P. Crooks and her husband, Theodore Crooks, appeal from a judgment in favor of defendants, Wal-Mart Stores, Inc. and its insurer, National Union Fire Insurance Company. We reverse.
On November 28, 1989, Mrs. Crooks was shopping at the Wal-Mart store in Pineville, and as she walked down an aisle, she came upon a Wal-Mart employee, John Governale, vacuuming the store's carpet. She waited for him to cross the aisle. As he moved across the aisle, the hose of the vacuum cleaner remained in the aisle. Mrs. Crooks noticed the hose and attempted to maneuver over it when she suddenly tripped and fell to the floor. Mrs. Crooks alleges that the employee pulled on the hose which caused it to rise off the floor and trip her.
Mr. and Mrs. Crooks filed this lawsuit against Wal-Mart and its insurer on November 27, 1990. Plaintiffs claim that Wal-Mart's employee, John Governale, caused Mrs. Crooks to trip by pulling on the hose as she attempted to step over it. In the suit, plaintiffs allege the negligence of Wal-Mart, its agents, representatives, and employees, as follows:
A. Carelessly and negligently failing to provide a safe place for petitioner to shop;
B. Carelessly and negligently designing and laying out the aisles so as to allow your petitioner to trip and fall;
C. Carelessly and negligently failing to warn of the dangers which were or should have been within the knowledge of the defendant, its employees, agents and representatives;
D. Carelessly and negligently allowing a hazard, the vacuum hose, to remain across an aisle provided for shoppers and your petitioner in particular, during normal store hours;
E. Carelessly and negligently pulling and lifting the hose so as to trip your petitioner when she attempted to continue down the aisle;
F. Carelessly and negligently failing to take other necessary and reasonable steps to provide a safe place for petitioner;
G. Creating a hazardous condition resulting in a trap to petitioner; and
H. All allegations of negligent fault are pled in the alternative where they may be inconsistent with another.
A jury trial was held on March 31, 1992. The jury rendered a verdict in favor of Wal-Mart and judgment was signed on April 21, 1992. The jury was given interrogatories. The first question, and the only one they answered, asked: "Do you find that the plaintiff, Jennie Crooks, proved to you by a preponderance of the evidence that there was a hazardous condition present at the Wal-Mart store in Pineville, Louisiana, on the date of this accident that caused the accident?" The jury responded, "No." After that, no other question had to be considered. (See Appendix A.)
Plaintiffs have appealed, asking this court to set aside the jury's findings of fact; to make an independent factual finding that Wal-Mart was negligent under the theories of respondeat superior and strict liability; and to render a verdict casting Wal-Mart liable for damages to be determined by this court in accordance with the evidence presented at trial.
*424 It is the plaintiffs' contention that such a result would be justified because the trial court's jury instructions and the verdict form interrogatories were erroneous, and because the trial court disallowed admissible evidence to go to the jury. They contend that these trial errors caused the jury to reach an erroneous verdict.

LAW AND PRINCIPLES
It is well settled that the trial judge has a duty to give instructions to the jury which properly reflect the applicable law in light of the pleadings and facts in each particular case. Proper jury instructions are those which fairly and reasonably point up the issues presented by the pleadings and evidence and provide correct principles of law for the jury to apply to those issues. It is also the judge's responsibility to reduce the possibility of confusing the jury. See Bruce v. Rogers Oil Tool Services, Inc., 556 So.2d 922 (La.App. 3d Cir.1990).
Further, a special verdict requiring a jury to return a special written finding on each issue of fact requires adequate jury interrogatories which fairly and reasonably point out the issues and which guide the jury in reaching a verdict. If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267 (La.App. 3d Cir.1989).
If error misled the jury, then this court must set aside the verdict and, if the record permitsif it is completethen this court must make its own findings of fact, and render a verdict. If, however, there is no error, or if the error did not induce the jury to reach an erroneous verdict, then the jury's findings and verdict are entitled to deference, and the standard of review is whether those findings were manifestly erroneousnot supported by the record. Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3d Cir.), writ denied, 565 So.2d 450 (La.1990); LSA-Const. Art. V, § 5(C); Art. V, § 10(B).

I.
We have reviewed the trial judge's instructions thoroughly and find they were adequate. The trial judge clearly set forth the principles of tort law, specifically liability under the theories of negligence and respondeat superior. The trial judge also instructed the jury on the law of merchant liability found in LSA-R.S. 9:2800.6.
The error lies not in the instructions, but in the interrogatories set out in the verdict form. The trial judge eliminated any interrogatories which inquired into the conduct of John Governale, Wal-Mart's employee. We agree with the plaintiffs' argument that such an omission discredited their claim of Governale's negligence in causing Mrs. Crooks' accident.
Contrary to Wal-Mart's contention, the law of merchant liability found in LSA-R.S. 9:2800.6 is not the exclusive remedy of a plaintiff who is injured in an accident on a merchant's premises. Most of the jurisprudence regarding merchant liability in the area of slip or trip and fall involves a hazard caused by spilled liquid or an item such as a box temporarily present in an aisle. LSA-R.S. 9:2800.6 applies to those cases and provides instruction as to the burden of proof in such cases. However, under the circumstances of the present case, and the allegations set forth in plaintiffs' petition, the accident is allegedly the result of a specific act on the part of Governale, and not solely the result of a condition found on the premises. Therefore, the principles of negligence are applicable. See Ardoin v. Dixieland Foods, Inc., 534 So.2d 107 (La.App. 3d Cir.1988)
When considering the entirety of the jury verdict form, it is obviously deficient in the omission of any interrogatory regarding employee negligence. We agree with the plaintiffs' argument that the jury was prevented from considering the actions or conduct of the Wal-Mart employee. The trial judge should have included an interrogatory to the jury as to the applicability of the conduct of the store employee under general *425 negligence principles and under the principles of respondeat superior found in LSA-C.C. art. 2320.
Finding error in the verdict form sufficient to mislead the jury, we must conduct a de novo review of the record, determine the preponderance of the evidence, and render whatever judgment that is just and lawful in the premises. See Jaffarzad, supra.

II.
Generally, negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. Dobson v. Louisiana Power & Light Co., 567 So.2d 569, 574 (La.1990). Whether a particular risk is unreasonable is a difficult question which requires a balance of the intended benefit of the conduct with its potential for harm and the cost of prevention. Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991). Whether a risk is unreasonable is determined by following the "Hand Formula" set out in Dobson, supra, 567 So.2d at 574, 575 as follows:
The amount of caution "demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice, or the cost of the precaution he must take, to avoid the risk.". L. Hand, J. in Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir.1940).
In determining whether Governale's actions were negligent, and liability attaches, we must review the facts under the dutyrisk analysis. The plaintiffs must establish that:
(1) The conduct of which plaintiff complains was a cause in fact of the harm;
(2) The defendant owed a duty to the plaintiff;
(3) The duty owed was breached; and
(4) The risk of harm caused was within the scope of the breached duty.
Socorro, supra, 579 So.2d at 938, 939.
A defendant's conduct is actionable under the duty-risk analysis where it is both a cause in fact of the injury and a legal cause of the harm incurred. Sinitiere v. Lavergne, 391 So.2d 821, 825 (La. 1980). The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained. The legal cause test requires that there be a substantial relationship between the conduct complained of and the harm incurred. Sinitiere, supra, 391 So.2d at 825, 826.
LSA-C.C. art. 2320 provides that the employer is liable for the damage caused by his employee in the exercise of the functions in which he is employed, unless he can show that he could not have prevented the act which caused the damage.
There is no dispute that Governale was an employee of Wal-Mart, involved in his function as an employee in vacuuming the store's floors. As to his actions, Mrs. Crooks offered her own testimony to prove that Governale pulled the vacuum cleaner hose across the aisle and, in doing so, caused her to trip and fall. Mrs. Crooks testified that as a result of the fall, she suffered injuries which required medical attention. Additionally, Gwen Cooper, the assistant manager at the Wal-Mart store, testified in her deposition and at trial, that in writing up the incident report, Governale told her he "tried to move the hose." There is ample evidence, both direct and circumstantial, in the record to indicate that the movement of the hose by Wal-Mart's employee caused Mrs. Crooks to fall. The combination of these facts created a situation which presented an unreasonable risk of harm to store customers.
Therefore, we conclude that Governale negligently performed his employee function while vacuuming, in (1) not warning Mrs. Crooks that he was going to pull the vacuum cleaner hose across the aisle, and (2) in pulling the hose without first ascertaining the safety of doing so. Consequently, we find Wal-Mart liable to plaintiffs under the theory of respondeat superior under LSA-C.C. art. 2320.

*426 CONTRIBUTORY NEGLIGENCE OF MRS. CROOKS

Having determined that Wal-Mart was guilty of fault, we must also consider whether Mrs. Crooks was guilty of fault that was a causal factor of her injuries. LSA-C.C. art. 2323. Ordinarily the factfinder's allocation of fault is subject to the manifest error rule. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984). In the instant case, the jury never reached the issue of Mrs. Crooks' negligence. We have, therefore, examined the evidence from the standpoint of making a fair and equitable allocation. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). We note that Wal-Mart specifically pleaded comparative negligence in its answer. An objective, reasonable man standard controls in viewing Mrs. Crooks' conduct and in assessing any contributory negligence; the query: what would a reasonable man do under like circumstances for his own safety and protection? Gray v. Louisiana Downs, 585 So.2d 1238 (La.App. 2d Cir.1991).
A patron is charged with using reasonable care for his own safety and must see and avoid obvious hazards. Bolin v. National Tea Co., 359 So.2d 690 (La.App. 1st Cir.), writ denied, 362 So.2d 577 (La.1978). A customer's duty to keep a proper lookout for obstacles in aisles is diminished if shelved merchandise distracts customer. Perez v. Wal-Mart Stores, Inc., 608 So.2d 1006 (La.1992). However, by Mrs. Crooks' own admission, she saw the employee vacuuming, saw the hose and chose to walk over it, rather than take another route. She admits she was not distracted by shelves, merchandise, or displays; nor was there anything to block her view of the hose on the floor. In fact, she stopped and waited for a few seconds before she chose to go further and attempted to cross over the hose. A person, while not required to exercise the utmost caution at each moment to avoid every hazard, has a duty to see and avoid obvious hazards. Weber v. Buccola-McKenzie, Inc., 541 So.2d 315 (La.App. 5th Cir.1989); Meshell v. Shamsie, 528 So.2d 1023 (La.App. 3d Cir.1988). Additionally, in this case, plaintiff was not an unsuspecting shopper who suddenly tripped over some obstacle in her path. Therefore, we find that plaintiff's own actions were not those of a reasonably prudent person and that her failure to exercise ordinary care for her own safety, under the instant facts, clearly constituted contributory negligence. See Dupas v. City of New Orleans, 354 So.2d 1311 (La. 1978); Ardoin, supra.
In allocating fault between the parties, we apply the principles of comparative negligence as discussed in Watson, supra. In determining fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and damages claimed.[1] In this case, when applying the facts surrounding the fall to the Watson factors, it was the combined negligence of both Governale and Mrs. Crooks which set in motion the chain of events that caused Mrs. Crooks' injuries. Therefore, we allocate fault between the parties at 75% to Wal-Mart and 25% to Mrs. Crooks.
If a person suffers injury as a result of his own negligence and partly as a result of the fault of another person, the amount of damages shall be reduced in proportion to the percentage of negligence attributable to the person suffering the injury. LSA-C.C. art. 2323.

QUANTUM
The jury did not address the measure of damages to either of the plaintiffs. However, the record concerning their respective injuries and/or losses is adequate so we will make an award based on the *427 standard of fairness in the premises. LSA-C.C.P. art. 2164.
At the time of the accident, Mrs. Crooks was 59 years old. She had a history of hypertension, was diabetic, and was obese. She had multiple operations in the past. In 1980, Mrs. Crooks fell on her back, buttocks, and hip. She experienced frequent headaches as a result. In 1981, Mrs. Crooks aggravated her back again while picking up beans. She had been on arthritis medication as early as September of 1989. She admits she had aches and pains in her knees prior to the accident. However, she testified at trial that prior to the Wal-Mart fall, she had remained "very active." She stated that she walked sometimes three or four miles, gardened, and did a lot of yard work. She stated that she and her husband camped, cooked out, and danced. She stated that she did a quite a bit of traveling prior to the fall at Wal-Mart. Since the accident, she testified that she still takes vacations, however, she is forced to stop more often. She testified that she still walks, but cannot go walking as long as before. She also testified that her husband and she have had "lots of problems because of this." She did admit that she still rakes leaves, still goes shopping, and went to work after the Wal-Mart incident, in early 1990.
As a result of the fall at Wal-Mart, Mrs. Crooks alleges she sustained injuries to her left knee and to the cervical region of her spine. At trial, she admitted that her back pain had gotten better. The significant injury in this case is the injury to the left knee.
She introduced the testimony of several physicians. We will concentrate our determination on the testimony of Dr. Christopher Rich and Dr. John Leglue, Jr. Although Drs. Robert Po, Rajinder Verma and Curt Smith testified at trial, a synopsis of their testimony would be repetitive, cumulative, and unnecessary.
We do note that on the date of the accident, Mrs. Crooks went to the emergency room at Cabrini Hospital in Alexandria. Apparently, upon that visit, Mrs. Crooks' left knee and elbow were x-rayed. In the radiologist's report, no fractures were indicated, however, minimal spur formation was present compatible with early arthritic changes. She was advised to continue her arthritis medication, Feldane.

TESTIMONY OF DR. CHRISTOPHER RICH
A week after the accident, on December 5, 1989, Mrs. Crooks was seen by Dr. Christopher Rich, an orthopedic surgeon at the Alexandria Orthopedic Clinic. Dr. Rich testified at trial regarding his diagnosis and treatment.
On this initial visit with Dr. Rich, Mrs. Crooks complained of left elbow and left knee pain. The examination of her left elbow was normal; the examination of her left knee revealed a bruise over the front outer aspect, but she did have normal motion and no swelling. It was his opinion that the bruises would resolve themselves in time.
Mrs. Crooks returned to see Dr. Rich later that same month, complaining of pain in her left shoulder, arm and wrist area, and neck. Dr. Rich performed a complete cervical examination and found her neck range and motion were normal. Additionally, her motion in her shoulder, elbow, wrist and hand was normal.
After two months' time, she was still suffering enough to return to Dr. Rich. In February, 1990, her complaints were primarily her upper extremity and pain, numbness, and tingling in the fingers on her left hand. According to Dr. Rich, these symptoms were consistent with nerve impingement.
Dr. Rich ordered an EMG and nerve conduction study. These tests were performed by Dr. John LeGlue. The results indicated a mild problem with the C6 and C7 nerve distribution, but no specific impingement or pressure on the nerve. Dr. Rich referred her to a physical therapist for treatment.
On March 6, 1990, Mrs. Crooks again sought consultation with Dr. Rich. On this visit, in addition to the complaints of arm pain, she complained that the knee pain had *428 returned. Dr. Rich did note that the physical therapy had helped with the arm pain. He examined her knee and noted some decreased flexion of the knee and a slight diffusion (swelling of the joint itself) with some tenderness or pain on the outer side of the joint. At this time, Dr. Rich suspected Mrs. Crooks had a tear in the lateral cartilage or the lateral miniscus. An MRI of the miniscus was normal, and revealed primarily osteoarthritis in the knee. Dr. Rich continued to have Mrs. Crooks treated with physical therapy.
Eventually, Dr. Rich performed a diagnostic arthroscopy which confirmed osteoarthritis in that knee. Dr. Rich prescribed an anti-inflammatory medication, Volataren, which is arthritis-type medication. This drug upset Mrs. Crooks' stomach and Dr. Rich switched her prescription back to Feldane, the same medication she had taken for her heel spurs.
Two months after the arthroscopy, Mrs. Crooks was examined again by Dr. Rich. He noted that her pain had diminished and the motion in her knee had improved and she had maintained keeping her full motion. He recommended to Mrs. Crooks that she do activities that she could tolerate and scheduled another visit in four weeks.
On that visit, Mrs. Crooks was again complaining of problems in the left knee. Dr. Rich opined that he felt the pain and the motion were better. Mrs. Crooks returned to Dr. Rich a month later, in August, 1990, still complaining of moderate pain in the knee. It was on this visit, that knee replacement surgery was discussed as a treatment option for the arthritis and symptoms of pain.
Total knee replacement surgery was performed in December, 1990. During Mrs. Crooks' recuperation, she still had problems primarily with flexion (bending of the knee). Although she did experience some pain, Dr. Rich testified that the primary reason for the pain was the lack of flexion. Dr. Rich placed her in physical therapy with Dr. Gene Noel in Alexandria. Once the motion and flexion were achieved, Dr. Rich discontinued the physical therapy in May, 1991.
Dr. Rich continued to have follow up consultations with Mrs. Crooks. By October of 1991, Mrs. Crooks had lost motion and was still having pain. Finally, Dr. Rich testified that the Wal-Mart fall was related to the pain Mrs. Crooks had been experiencing during the course of his treatment of her knee.
On cross-examination, Dr. Rich testified that the osteoarthritis was present in Mrs. Crooks' knee prior to the Wal-Mart fall. According to Dr. Rich, osteoarthritis is an ongoing degenerative process, not caused by any specific injury unless it involves a fracture through the joint itself, which was not the case with Mrs. Crooks. Although Dr. Rich testified on direct that the Wal-Mart accident was related to the pain and resulting treatment of her left knee, he could not point to or reveal any evidence that the fall caused damage to Mrs. Crooks' knee. He admitted that he was strictly relying on Mrs. Crooks' statement that she did not have any pain in that knee until the fall at Wal-Mart.
Dr. Rich also testified that he recommended that Mrs. Crooks undergo a type of manipulation while she was under anesthesia and that Mrs. Crooks never desired that this treatment be performed.
On re-direct, Dr. Rich testified that a knee joint with arthritis would be more prone to having symptoms after a fall such as the one Mrs. Crooks had taken in Wal-Mart. He further testified that he felt Mrs. Crooks was consistent and straightforward with him about the accident and the injury.

TESTIMONY OF DR. JOHN LEGLEU, JR.
Dr. John Leglue, Jr., a physician specializing in physical medicine and rehabilitation, first saw Mrs. Crooks in February, 1990, when he performed an EMG and nerve conduction study on her. He was not her treating physician, only a consultant on her case with Dr. Rich.
He testified that Mrs. Crooks' complaints were of her left upper extremity and the tests were conducted to ascertain the *429 source of those complaints. The results of the tests were normal and according to Dr. Leglue, there was no evidence of spinal nerve damage at that point in time.
Dr. Leglue did not see her again until December of 1991, over nine months later. On that visit, Mrs. Crooks was complaining of pain on the left side of her neck with left arm pain, numbness, and weakness. He examined Mrs. Crooks and carried out another EMG and nerve conduction study. The results revealed a mildly abnormal EMG which was unlike the February study. Her EMG abnormalities were noted in the eighth cervical nerve area. He also noted abnormalities in the lower cervical area and concluded that she had carpal tunnel syndrome or a compression of the nerve out at the wrist level. As a result of these findings, Dr. Leglue ordered an MRI of the cervical spine. Dr. Leglue testified that the results of the MRI were abnormal, indicating "narrowing of the disc spaces at C5-6, C6-7 with associated degenerative posterior osteophyte formation causing stenosis." He also testified to the presence of a bone spur which puts pressure on the spinal cord. As a result of these findings, he recommended that Mrs. Crooks see a neurosurgeon. These findings were not admitted at trial. Although plaintiffs assign as error certain evidentiary rulings, plaintiffs do not argue or brief the issue of the neurosurgeon's findings.
Dr. Leglue was questioned on direct about the differential diagnosis between the two EMG and nerve conductions studies. He testified to wit:
A Those types of things are in the differential diagnosis. When I first saw Mrs. Crooks I didn't see any implications of nerve damage when I did the EMG and yet on the followup EMG we could see that there was evidently an evolutionary process and ongoing process causing some nerve damage in Mrs. Crooks' neck.
Q And is it true, doctor, that ofttimes nerve damage does not appear immediately after the accident and after the fall or whatever the particular mechanics of the injury are but as the person goes about their daily activities as they can that this become more evident and more evident and subject to testing and discovery as you conducted?
A Yes, that's correct.
On cross-examination, Dr. Leglue stated that the bone spur existed before the accident and was not caused by the Wal-Mart fall. He also testified that he did not know that Mrs. Crooks had complained of neck pain radiating into her arm as early as 1979.

TESTIMONY OF DR. JAMES C. McDANIEL
Wal-Mart presented the testimony of Dr. James C. McDaniel, an orthopedic surgeon in Lafayette. Dr. McDaniel examined Mrs. Crooks and reviewed all the available medical data. It was his conclusion that the arthroscopy "described very well typical osteoarthritic changes, wear and tear changes, not trauma damages." It was also his conclusion that the arthritis was attributable to her age, size, and probably heredity. He went further to state that given Mrs. Crooks' history of diabetes, and earlier hysterectomy, she was a perfect set up to develop weight-bearing osteoarthritis and "she got it in the weight-bearing part of her knee."

CONCLUSION
Based upon the medical evidence presented, we find that Mrs. Crooks carried her burden of proving that her condition became symptomatic as a result of the fall. In making an initial award of damages at the appellate level, we are not limited to either the highest or lowest amount which could be affirmed. Instead, based upon the record, we determine an award which would be just. Gray, supra, 585 So.2d at page 1244. From our review of the record, Mrs. Crooks suffered from osteoarthritis in her left knee which was exacerbated by the fall. Under these circumstances, Mrs. Crooks should be compensated for the aggravation of a pre-existing arthritic condition as well as for the other injuries described above.
*430 The record contains stipulated medical damages of $38,780.39. We also conclude that Mrs. Crooks should be compensated for pain and suffering. Because awards for pain and suffering are so subjective, reference to other reported cases of similar injuries can provide only broad guidelines. Cook v. Wal-Mart Stores, Inc., 540 So.2d 1017 (La.App. 2d Cir.1989); Hutchinson v. Wal-Mart, Inc., 573 So.2d 1148 (La.App. 1st Cir.1990); Matlosz v. Goza, 515 So.2d 537 (La.App. 1st Cir.1987); Ardoin, supra. Under the circumstances of this case, we find that an award of $100,000.00 is reasonable to compensate Mrs. Cooks for her pain and suffering.

LOSS OF CONSORTIUM
Mr. Theodore Crooks, sought damages due to the loss of consortium for his wife. He testified that the injury placed a strain on their marriage, specifically, that their sexual relations had suffered. In fact, he testified that he had moved into a separate bed because he may "hit her leg." Our review of the jurisprudential awards leads us to conclude that an award of $10,000.00 is adequate to compensate Mr. Crooks for his loss of society, sex, service and support. See Smith v. Winn-Dixie Louisiana, Inc., 574 So.2d 514 (La.App. 3d Cir.1991); Gray, supra; Miller v. Great Atlantic & Pacific Tea Co., 510 So.2d 695 (La.App. 1st Cir.), writ denied, 513 So.2d 1213 (La.1987); Montgomery v. Opelousas General Hosp., 546 So.2d 621 (La.App. 3d Cir.), writ denied, 551 So.2d 630 (La.1989).

CONCLUSION
For the reasons assigned above, the judgment of the trial court is reversed and set aside, and there is judgment in favor of the plaintiffs as follows:

DECREE
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Jennie P. Crooks, and against the defendants, Wal-Mart Stores, Inc. and its insurer, National Union Fire Insurance Company, in the full sum of ONE HUNDRED THIRTY-EIGHT THOUSAND SEVEN HUNDRED EIGHTY AND 39/100 ($138,780.39) DOLLARS, plus interest thereon at the legal rate, from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Theodore Crooks, and against the defendants in the full sum of TEN THOUSAND AND NO/100 ($10,000.00) DOLLARS, plus interest thereon at the legal rate, from the date of judicial demand until paid. Furthermore, all costs of these proceedings are assessed against the defendants.
IT IS DECREED that Plaintiffs' award is subject to a reduction of 25% as we allocate comparative fault to Mrs. Crooks at 25% and allocate fault to Wal-Mart at 75%.
REVERSED AND RENDERED.

APPENDIX A

CIVIL SUIT NUMBER 162,086

Jennie P. Crooks, et vir

Versus

National Union Fire Insurance Company, et al

Ninth Judicial District Court

Parish of Rapides

State of Louisiana

JURY VERDICT FORM

1.
DO YOU FIND THAT THE PLAINTIFF, JENNIE CROOKS, PROVED TO YOU BY A PREPONDERANCE OF THE EVIDENCE THAT THERE WAS A HAZARDOUS CONDITION PRESENT AT THE WAL-MART STORE IN PINEVILLE, LOUISIANA, ON THE DATE OF THIS ACCIDENT THAT CAUSED THIS ACCIDENT?
 YES--- NO &check; 
(If your answer is "NO", then go no further. Have the foreperson sign on the appropriate line and return to Court. If your answer is "YES" proceed to the next question.)

*431 2.
DO YOU FIND THAT THE DEFENDANT, WAL-MART STORES, INC., PROVED TO YOU BY A PREPONDERANCE OF THE EVIDENCE THAT THE CONDUCT OF THE PLAINTIFF, JENNIE CROOKS, CONTRIBUTED TO HER DAMAGES?
 YES___ NO ___
(If your answer is "YES" to this question, then proceed to Question Number 3. If your answer is "NO", then proceed to Question Number 4.)

3.
WHAT PERCENT OF FAULT DO YOU ASSIGN TO EACH PARTY?
 Jennie Crooks ______%
 Wal-Mart Stores, Inc. ______%
(The total must equal 100%)

4.
WHAT DAMAGES, IF ANY, DO YOU FIND THAT THE PLAINTIFF PROVED TO YOU BY A PREPONDERANCE OF THE EVIDENCE AS A RESULT OF THIS ALLEGED ACCIDENT?
 General Damages $_____
 Special Damages $_____

5.
WHAT DAMAGES, IF ANY, DO YOU FIND THE PLAINTIFF PROVED TO YOU BY A PREPONDERANCE OF THE EVIDENCE AS A RESULT OF THIS ALLEGED ACCIDENT WERE SUFFICED BY TED CROOKS?
 Loss of Consortium $_____
Please have the foreperson sign and date the form and return to the courtroom.
 /s/Glenroy Weisland
 FOREPERSON
 4-3-92
 DATE
NOTES
[1] In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including, (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.