DOUCET, Chief Judge.
The Defendants appeal a jury verdict awarding tort damages to an independent contractor working for them.
The facts in this case are not in dispute. James Corporation (James) is primarily a supplier of asphalt for highway projects. Prairie Construction Co., Inc., (Prairie) is a highway contractor. It bids on state highway contracts and subcontracts the asphalt to James. Both corporations are owned by the same |2man, Laddie L. James. Amar Ronald Johnson owned an 18-wheel dump truck and trailer. While he occasionally hauled for other companies, he spent ninety percent of his time hauling asphalt as an independent contractor for James. On July 6, 1998, Johnson was hauling asphalt for James to a job near Reeves, Louisiana, where Highway 190 was being overlaid. At about two o’clock, he parked his truck on the shoulder of the road. He went to ask the man on the state’s truck to give him some water to rinse his hands. In the meantime, Jesse Clark, an employee of James, pulled his tanning roller onto the shoulder behind the state’s truck. Clark testified that he had turned off the engine and begun to get out, when he realized the vehicle was still moving. He got back in and tried to stop it but it had already hit Johnson, who was standing behind the state’s truck pulling a can of water to the edge of the truck’s tailgate. Johnson was first thrown into a sitting position on the tailgate. The tanning roller hit him again and pinned him between the two vehicles. He was taken to the emergency room at St. Patrick’s Hospital in Lake Charles. There they x-rayed his knee, leg, neck and shoulder. They put a splint on his leg and gave him crutches to use. The hospital personnel wanted to admit him, but he wanted to go home and go to his local hospital. The next day he saw Dr. Stephen Nason for his leg injuries. A few weeks later, he began seeing Dr. Robert Rivet for pain in his neck, right arm and right shoulder. Ultimately, Johnson underwent a double cervical fusion, an occipital neurectomy and a left side carpel tunnel release.
Johnson and his wife, Barbara, filed this suit to recover damages for the injuries incurred in the incident. A worker’s compensation claim against James was also filed. This matter was tried to a jury. The parties stipulated 13that Johnson was an independent contractor. After hearing the evidence and being instructed in the law by the trial judge, the jury returned a verdict in the form of answers to jury interrogatories. The jury first responded in the negative to the first jury interrogatory: “Was the plaintiff, Amar Ronald Johnson, an independent contractor *318 performing a substantial part of his work time in manual labor in furtherance of his contract and which contract formed a part of James Corporation trade, business, or occupation at the time of the accident?” The jury further found that Johnson was entitled to recover $38,000.00 for past medical expenses, $5,000.00 for future medical expenses, $20,-000.00 for past lost wages or loss of earning capacity, $186,000.00 for future loss of wages or earning capacity and $20,000.00 for pain and suffering. The jury found that Barbara Johnson was entitled to $4,000.00 for loss of consortium. The Plaintiff filed a motion for judgment not withstanding the verdict (JNOV) asserting that the award of general damages was inadequate. The Defendants filed a motion for JNOV and, alternatively, for a new trial arguing the award for loss of earning capacity was contrary to the evidence produced at trial. The trial judge granted the Plaintiffs’ motion for JNOV and increased the award of general damages to $100,000.00. The judge denied the Defendants’ motions for JNOV and new trial.
Clark, James and Audubon appeal.
INDEPENDENT CONTRACTOR STATUS

Did the trial judge give the jury an incorrect instruction and jury charge regarding Johnson’s eligibility to sue for tort damages?

The Defendants first argue that the trial court erred in the jury instructions and the verdict form given to the jury insofar as concerns the effect Uof his status as an independent contractor on his ability to recover damages in tort.
The trial judge instructed the jury as follows:

A CONTRACTORS IMMUNITY FROM SUIT FOUNDED IN TORT BY AN INDEPENDENT CONTRACTOR

In this case, the defendant, James Corporation, is urging that the plaintiff, Mr. Johnson, be prohibited from making a recovery of damages based on the negligence of Mr. Jessie Clark because of the fact that the plaintiff was an independent contractor who spent a substantial part of his work time in manual labor in carrying out the terms of his contract with James Corporation. Additionally, the contract between Mr. Johnson and the James Corporation general contractor must involve services which are an integral part of the trade business, or occupation of James Corporation.
Now, the above concept has several integral parts which require further explanation. Those items which require further explanations are as follows: 1. Independent contractor; 2. Substantial part of his work time; 3. Manual labor; 4. Services arising out of the trade, business or occupation of James Corporation. I will now address each of these items independently. As I told you there are four items. I have the portion here that relates to independent contractor. I’m not going to discuss the term independent contractor with you because the parties to this case have stipulated, they have agreed to the fact that Mr. Johnson was an independent contractor. It is the other three items that they are in disagreement with and so it is the other three items that I’m going to discuss with you at this time.
1. The phrase, Substantial part of his work time, I’m going to-repeat, substantial part of his work time — While in some legal senses “substantial” indeed has the signification of the larger part, such as in “substantial compliance,” legally the words “substantial part” also are used not as a term of mathematical precision, but so as to mean the converse of insubstantial or immaterial.
2. Manual labor — The test for defining “manual labor” is where the physical element predominates over the mental element.
3. Such services arose out of the principal’s, general contractor, here, James Corporation. Such services arose out of James Corporation’s trade, business or occupation. I’m going to read that one again. And this is the last |5principal that I’m going to discuss. Such services arose out of James’ Corporation’s trade, business or occupation — the appropriate standard for determining whether the contract work is *319 part of the principal’s trade, business or occupation of James corporation is for the finder of fact to consider all pertinent factors under the totality of the circumstances. The presence or absence of any one factor is not determinative, and the presence of one factor may compensate for the lack of another. Among those factors to be considered are the following, I’m going to repeat, among those factors to be considered are the following and there are eight in number:
(1) The nature of the business of James Corporation;
(2) Whether the work was specialized or non-speeialized;
(3) Whether the contract work was routine, customary, ordinary or usual;
(4) Whether the James Corporation customarily used its own employees to perform the work, or whether it contracted out all or most of such work;
(5) Whether James Corporation had the equipment and personnel capable of performing the contract work;
(6) Whether those in similar businesses normally contract out this type of work or whether they have their own employees perform the work;
(7) Whether the independent contractor, Ronald Johnson, was an independent business enterprise who insured himself and his own workers and included that cost in the contract; and
(8)Whether James Corporation was engaged in the contract work at the time of the incident.
Finally, I would suggest to you that this theory of law, and by this theory of law I’m referring to the community, that this theory of law is a defense urged by the defendant, James Corporation, and accordingly, it is what is known as an affirmative defense on the part of James Corporation and thus the said defendant, James Corporation, has the burden of proving this defense. In other words, it must prove by a preponderance of the evidence, that at the time of the accident the plaintiff, Mr. Johnson, was in fact an independent contractor, that he spent a substantial part of his work time in manual labor carrying out his contract for James Corporation, and that said contract services are an integral part of James’ trade, business, or occupation.
| (¡The Defendants argue that this charge, and consequently, the above referenced jury interrogatory, incorrectly states the law applicable to Johnson. Defendants contend that the law laid out in the judge’s charge to the jury is a statement of La.R.S. 23:1061 [1], and of Kirkland, v. Riverwood International USA, Inc., 95-1830 (La.9/13/96); 681 So.2d 329, which interprets that statute. The Defendants argue that La.R.S. 23:1061 concerns the liability of a principal to the employees of an independent contractor. Defendants as *320 sert that Johnson’s claim is covered by La. R.S. 23:1021(6) which provides that:
As used in this Chapter, unless the context clearly indicates otherwise, the following terms shall be given the meaning ascribed to them in this Section:
(6) “Independent contractor” means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial |7part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter.
The Plaintiffs argue that this provision applies only to independent contractors doing work which forms part of the principal’s “trade, business or occupation.” In support of this position they cite the supreme court’s decision in Lushute v. Diesi, 354 So.2d 179 (La.1977). The court in Lushute, found that under La.R.S. 23:1021(6), an independent contractor’s exclusive remedy is in worker’s compensation only when a substantial part of his work time is spent in manual labor carrying out his contract with the principal and the work he performs is part of the trade, business or occupation of the principal. While this approach has been questioned as having no statutory support[2], the courts have continued to follow this precedent essentially without deviation. Brown v. State Farm Fire & Casualty Co., 407 So.2d 1251 (La.App. 3 Cir.1981); Miller v. Atlantic Richfield Co., 499 So.2d 1095 (La.App. 3 Cir.), writ denied, 501 So.2d 198 (La.1986); Rush v. Employers Nat. Ins. Co., 598 So.2d 603 (La.App. 4 Cir.), writ denied, 605 So.2d 1364 (La.1992); Franklin v. Checker Cab Co., Inc., 572 So.2d 773 (La.App. 4 Cir.1990); Locker v. Wilson, 536 So.2d 441 (La.App. 2 Cir.1988), writ denied, 537 So.2d 210 (La.1989). Therefore, in spite of the questionable validity of this approach, it appears that the courts are bound by the decision in Lushute, 354 So.2d 179. Since the supreme court in Lushute, adopted the trade, business or occupation test from La.R.S. 23:1061, we cannot say that the trial court, in instructing the jury in the correct way to determine whether the work done was part of the trade, business or occupation of the principal, erred in adopting the supreme court’s criteria from Kirkland, 95-1830; 681 So.2d 329, which dealt with that portion of La.R.S. 23:1061. Therefore, we cannot say that the instruction given the jury, or the interrogatory used in reaching a verdict was an incorrect expression of the current state of the law on this point.
Adequate jury instructions fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. The instructions must properly reflect the law applicable in light of the facts of the particular case. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5 Cir.), writ denied, 434 So.2d 1097 (La.1983).
Todd v. Sauls, 94-10, p. 3 (La.App. 3 Cir. 12/21/94); 647 So.2d 1366, 1371, writs denied, 95-0206, 95-0219 (La.3/24/95); 651 So.2d 289.
Accordingly, we cannot say the court erred in the instruction given the jury or in the *321 interrogatory presented to it for use in reaching a verdict.

Was Johnson’s work part of the trade, business or occup/xtion of James Corp?

In connection with their second assignment of error the Defendants seem to be arguing that because James could not have done business without the services of truckers to haul the asphalt, Johnson was doing work which constituted a part of James’ trade, business or occupation. Therefore, they contend that the jury erred in failing to finding that Johnson’s exclusive remedy bwas in compensation.
As stated the court correctly instructed the jury with regard to the criterion to be used in determining whether the work done by Johnson was part of the trade business or occupation of James. The supreme court in Kirkland, 95-1830, pp. 14-15; 681 So.2d at 336-87, outlined the factors to be considered in making this determination.
(1) The nature of the business of the alleged principal;
(2) Whether the work was specialized or non-specialized;
(3) Whether the contract work was routine, customary, ordinary or usual;
(4) Whether the alleged principal customarily used his own employees to perform the work, or whether he contracted out all or most of such work;
(5) Whether the alleged principal had the equipment and personnel capable of performing the contract work;
(6) Whether those in similar businesses normally contract out this type of work or whether they have their own employees perform the work;
(7) Whether the direct employer of the claimant was an independent business enterprise who insured his own workers and included that cost in the contract; and
(8) Whether the principal was engaged in the contract work at the time of the incident.
Thus the determination of whether the contract work was part of the principal’s trade, business or occupation is a factual issue to be resolved on a ease-by-case basis. Lewis v. Exxon Corp., 441 So.2d 192 (La.1983).
Two employees of James testified with regard to the work done by James and the work done by the truckers. Hubert Bou-dreaux, the office manager for James, testified first. He stated that he does the book work for the firm and works up the truckers’ payments or settlements. He testified that | ipJames manufactures asphalt and lays the asphalt at the job sites. James does not own any’ dump trucks. All its asphalt is trucked to the job sites by independent contractors. James bought one large truck and two trailers for this purpose at some time in the past. However, James decided not to use them. That equipment had been out of use for at least two years at the time of the trial, according to Boudreaux. Boudreaux testified that James had no truck drivers on its payroll. He stated that all asphalt hauling for James had been done by independent truckers during the twenty-two to twenty-three years he had been working for James. Each trucker furnishes his own truck and pays his own expenses. James has a gas pump and sells gasoline to the truckers but they are not required to buy gas from James. Boudreaux further testified that truckers are paid by the “ton mile.” The distance to each site is calculated at the beginning of a job and truckers’ mileage is calculated based on that figure for all loads hauled on that job. Each trucker is given a weigh ticket for each haul. Each turns in his tickets twice a month and a settlement is calculated accordingly. Truckers are not normally paid for trips back to the plant. However, if the asphalt is not needed at the job site, the trucker will be paid half the rate he was paid to haul the load to return it to the plant. Any gas purchased is deducted from the settlement. Boudreaux stated that truckers are required to show proof of liability insurance. However, James does not require proof of Workers’ Compensation insurance. James’ workers’ compensation insurance premium is calculated according to the man hours worked by James’ employees. The truckers’ hours are not included in this figure. Boudreaux testified that because James both manufactures asphalt and lays it down *322 at the job site, they could not function without the truckers.
| nGIyndon Brown, is manager of James’ Opelousas asphalt plant. He is in charge of obtaining the services of truckers to haul asphalt from that plant. In great part, his testimony tracked that of Boudreaux. However, he additionally testified that individuals can buy asphalt from the plant. He testified that James does not enter into written contracts with the truckers. He further indicated that truckers find their own replacement drivers. Brown stated that he directs activity at the plant. However, he stated that he tells truckers where to take the asphalt but not how to drive their trucks.
Ronald Johnson testified that about 90% of his time was spent hauling for James. However, if James did not have work for him he called other businesses. Additionally, when he felt James was not paying enough he turned to other forms of hauling. He stated that he paid for his own maintenance, repairs and gasoline. He stated that no one at James told truckers how to do their jobs.
In light of this testimony and considering the factors enunciated by the supreme court in Kirkland, 95-1830; 681 So.2d 329, we cannot say that the jury erred in finding that the work done by Johnson was not a part of the trade, business or occupation of James.
JURY CHARGE-LOSS OF EARNING CAPACITY
The Defendants further assert that the trial judge erred in refusing to give their charge with regard to loss of earning capacity.
Segura v. State Farm Ins. Co., 94-1428, pp. 4-5 (La.App. 3 Cir. 5/31/95); 657 So.2d 1047, 1050, provides a thorough review of the law applicable to assignments of error concerning jury instructions:
A trial court should give all requested instructions that are material and relevant to the litigation. Lincecum v. Missouri Pacific R. Co., 452 So.2d 1182 (La.App. 1 Cir.), writ denied, 458 So.2d 476 (La.1984). Failure to instruct the jury regarding an essential legal principal may constitute reversible error, Evangeline Farmers Co-op. v. Fontenot, 565 So.2d 1040 (La.App. 3 Cir.1990), but courts are not obligated to give the specific jury instructions submitted by the parties, Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3 Cir.1991). A court has fulfilled its duty if its instructions fairly and reasonably point out the issues presented by the pleadings and evidence, and provide the principles of law necessary to resolve those issues. Crooks v. National Union Fire Ins. Co., 620 So.2d 421 (La.App. 3 Cir.), writs denied, 629 So.2d 391, 392 (La.1993).
Moreover, even if a trial court errs by refusing to give a requested instruction, an appellate court should overturn a jury verdict on this ground only when it is clear that the instructions, taken as a whole, are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts. Laborde v. Velsicol Chem. Corp., 474 So.2d 1320 (La.App. 3 Cir.1985), writ denied, 480 So.2d 738 (La.1986). An appellate court must exercise great restraint before overturning a jury verdict on the basis of erroneous instructions. Creel v. S.A. Tarver & Son Tractor Co., 537 So.2d 752 (La.App. 1 Cir.1988).
Hebert v. Podiatry Ins. Co. of America, 96-567 (La.App. 3 Cir. 10/9/96); 688 So.2d 1107, 1115-16, citing Segura, 94-1428; 657 So.2d 1047.
At trial, counsel for the Defendants objected to the trial judge’s jury charge because it did not adequately outline the factors to be considered by the fact finder in determining a loss of earning capacity. On appeal, the Defendants cite Pierce v. Milford, 96-92 (La. App. 3 Cir. 9/25/96); 688 So.2d 1093, 1095, as correctly outlining those factors:
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiffs condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work *323 life remaining, inflation, and the plaintiffs employment opportunities before and after the accident.
Finnie, 620 So.2d at 901.
At trial the judge stated that the instructions he gave to the jury with regard to damages were sufficient to allow the jury to reach a verdict in keeping with the applicable law. The charges given by the trial judge are quite extensive. Therefore, we will not reproduce it here. However, our review of the charges convinces us that they “fairly and reasonably point out the issues presented by the pleadings and evidence, and provide the principles of law necessary to resolve those issues.” Hebert, 96-567, at p. 14; 688 So.2d at 1115. Accordingly, we find no error in the trial judge’s failure to give the charge requested by the Defendants.
JNOV
The Defendants contend that the trial judge erred in granting the Plaintiffs’ motion for judgment notwithstanding the verdict (JNOV) on the issue of general damages. The Defendants further argue that because the jury abused its discretion in making an excessive award for loss of earning capacity, the trial judge should have granted their motion for judgment not withstanding the verdict with regard to loss of earning capacity. As we have stated, the jury originally made a general damage award of $20,000.00. The trial judge, in response to the Plaintiffs’ motion for JNOV, increased the award to $100,000.00.
This court in Manville v. Citizen, 96-861 (La.App. 3 Cir. 2/5/97); 689 So.2d 578, 584, citing Anderson v. New Orleans Public Serv. Inc., 583 So.2d 829, 834 (La.1991) (alterations in original), outlined the standard of appellate review of a JNOV in connection with the quantum of damages.
The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in Scott [v. Hospital Service District No. 1, 496 So.2d 270 (La. 1986) ], i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low. If the answer is in the affirmative, then the trial court h4erred in granting the JNOV, and the jury’s damage award should be reinstated. On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under the constraints of Coco [v. Winston Industries, Inc., 341 So.2d 332 (La.1976)].
Consequently, we will examine the record in order to determine whether reasonable men “in the exercise of impartial judgment” could differ as to whether the jury’s award for loss of earning capacity was abusively high and whether its award of general damages was abusively low.
Defendants argue that Johnson had a preexisting cervical degeneration which, within five years, would have required similar surgeries and caused similar disability to those experienced by Johnson after the accident.
Approximately ten months prior to the accident, Johnson began experiencing a pulling sensation on the right side of his face. Fearing a stroke, he visited Dr. John Jackson in New Orleans. Because his complaints were cranial, Dr. Jackson referred him to his partner, Dr. Roger Smith, a neurosurgeon. Dr. Smith’s deposition testimony was introduced at trial. Dr. Smith testified that Johnson gave a history of having had a back injury in 1981 which caused him to miss work for several months. He gradually improved and was able to return to work. However, Johnson reported that he had some intermittent spinal pain and had begun having cervical pain a year or two previously. He was examined by Smith on September 26, 1994, at which time he was complaining of the sudden onset of numbness on the left side of his | igface and tongue. His mouth was pulled to the right. His vision was blurred but he did not have double vision. His facial weakness and numbness had improved somewhat by the time of the examination. Dr. Smith ordered a number of diagnostic studies of the head and brain in an attempt to diagnose the problem. Although the studies did not allow *324 Smith to pinpoint the cause of the facial problems, they did show a moderate disc space narrowing and spurring at C5-6 and C6-7. However, Dr. Smith did not think that the cervical findings had any relationship to the facial complaints. Further, Smith found no muscle spasm in the neck, no weakness or numbness of the arms or legs. Nor did Johnson complain of right sided arm pain. Smith did not give an opinion with regard to Johnson’s future need for neck surgery based on his condition in September 1994.
The day after the accident, Dr. Stephen Nason saw Johnson in connection with his leg injury. Johnson’s leg was swollen with a small blackened area on the thigh. There was a lot of tenderness and swelling. Nason found that there was a small amount of fluid collected inside the knee. Johnson was unable to move the knee more than just a tiny jog one way or the other. The shin area was also bruised and abraded, with a good deal of tenderness. Johnson’s calf muscles were swollen and tight. Nason reviewed the x-rays done previously and did not see any bone injury or joint abnormality. He told Johnson to stay in the knee brace and keep ice on the knee for a total of forty-eight hours. He told Johnson to continue to use crutches to keep the leg elevated and to stay off it. He prescribed a variety of medications including an anti-inflammatory, a muscle relaxer, and pain medications. Although his examination centered on the right leg injury, Johnson was also complaining of | i ¡¡headache and pain in his neck, right shoulder and right arm. On his next visit, Dr. Nason found some improvement. The swelling was down in the thigh and lower leg. However, Johnson was still unable to move his knee much. Nason prescribed physical therapy to help improve the movement in the knee. After two weeks of physical therapy, the knee had improved considerably. Johnson could bend the knee up to 120°, which the doctor considered good but not full motion. The swelling had gone down further but Johnson was still unable to put much weight on the leg. Johnson’s pain pattern had changed. The pain was up the outer side of the thigh, with pain at times in the front part of the hip joint. Nason felt this pain was from an irritation of the tensor fascia. He discontinued the physical therapy but suggested that Johnson continue to soak the leg in the tub at home. By August 17, Johnson was walking on the leg. However, his knee tended to give out on him. Nason gave him a brace to give the knee support and prevent the knee from giving away. Dr. Nason continued to see Johnson in connection with his leg injury at regular intervals though November 1996. His condition continued to improve through that time. However, Nason expected that Johnson would have some discomfort from the leg from time to time for the rest of his life and that he will have to take some medication for inflammation and discomfort. He opined that the more active Johnson is, the more pain he will have.
On July 28, 1995, Dr. James Robert Rivet began treating Johnson for neck, right shoulder and right arm symptoms. Rivet reviewed the X-rays taken at St. Patrick’s hospital. He felt that they showed significant arthritic changes at C5-6 and more markedly at C6-7. Rivet stated that Johnson related that Drs. Jackson and Smith had told him he had possible disc problems in his |i7neck which could take some years before requiring surgical intervention. On this first visit to Dr. Rivet, Johnson was complaining of pain in his neck, right arm and shoulder. He told Rivet that pain sometimes went down his right arm into his right hand. On examination, Rivet found tenderness over the mid-cervical spinous process with bilateral spasm. Rivet ordered a myelogram and a post-mye-logram CAT scan. The test was run by Dr. Harold Domingue. Rivet and Domingue reviewed the test results. Rivet diagnosed severe arthritic changes with disc degeneration and rupture at the C5-6 and C6-7 levels. He felt the degenerative changes were severe for a man Johnson’s age. He stated that it is fairly common for someone to have these kinds of changes and still be able to function, even do manual labor. However, an accident may make the preexisting condition symptomatic. From Johnson’s history, Rivet concluded that the accident rendered Johnson’s condition symptomatic. Rivet recommended surgery. A double level fusion was done on August 8, 1995. After he cut into Johnson’s neck, Rivet saw that the discs *325 were actually herniated and putting pressure on the spinal roots as they went out. Even though Johnson was not having left side symptoms, there was as great a problem on the left as on the right. Johnson woke up from the surgery without right arm symptoms but with numbness in his left arm. Rivet felt this numbness was a bi-product of the surgery. The fusion became solid after three months. However, Johnson continued to have problems. On each of the visits after surgery, Johnson’s left shoulder hurt and he began to have numbness down into his thumb and index finger. Additionally, Johnson began having headaches in the back of his head. When the doctor pushed on the occipital nerve it was tender. He diagnosed the headaches as occipital hsneuralgia resulting from the pressure of the cervical collar on the occipital nerve and/or the chronic osteoarthritis. After several injections failed to alleviate the condition, the doctor performed an occipital neurectomy. He cut the occipital nerve in an outpatient procedure. This alleviated the headaches. Because of the left arm and hand numbness, Rivet sent Johnson to Dr. Domingue for nerve conduction studies. The studies showed problems with the media nerve at the wrist and dener-vation of two nerve roots in the neck. Do-mingue suggested another myelogram and post-myelogram CAT scan. Rivet found that the tests showed that Johnson still had problems with arthritic changes in his neck which were causing continued pressure on the nerve roots at two levels. He felt that it was possible Johnson needed additional surgery to get the pressure relieved. Rivet sent Johnson to his partner, Dr. Hurst, for a second opinion.
Hurst felt that Johnson had carpel tunnel syndrome. He did not recommend more surgery. He suggested that Johnson receive more physical therapy or conservative management. The carpel tunnel syndrome symptoms continued to worsen. On Johnson’s last visit with Rivet, on December 9, 1996, Johnson had not decided whether he wanted to have carpel tunnel release surgery. Rivet opined that Johnson should avoid heavy activities. He stated that Johnson can expect to have discomfort in his neck and arms from time to time and will need medication to alleviate those symptoms.
On December 12, 1997, Johnson went to Dr. Frazer Gaar for an independent medical examination. Dr. Gaar reviewed the diagnostic test results taken before the neck surgery. He saw abnormalities at C5-6 and C6-7. He thought the abnormalities were compatible with preexisting cervical _[i9degenerative disc disease and concomitant spurs or spondylolysis. He stated that spurs don’t form overnight but take years to form. He did not note any acute fractures or disc herniations. He believed that all he saw was disc aging. He admitted that an accident can make a degenerative condition symptomatic.
In January 1997, Johnson went to Dr. Na-son in connection with the carpel tunnel syndrome. His symptoms were as described by Dr. Rivet. Dr. Nason discussed the release procedure with Johnson. The operation was done on January 28, 1997 on an outpatient basis. The operation relieved most but not all of the symptoms. Nason stated that Johnson can expect some numbness to continue, although the symptoms should lessen with time. Neither he nor any of the other doctors could say with certainty what brought on the carpel tunnel syndrome. However, he stated that peripheral nerve problems are more likely to occur in people with central nervous system problems. Na-son felt Johnson could go back to light driving activities but not to driving heavy trucks or to any kind of work which would require turning the neck or activities which would subject the neck to jarring or vibration.
Dr. Robert Franklin, a specialist in physical therapy and rehabilitation, began treating Johnson on September 30, 1996. Johnson had continued complaints of pain in his upper back and neck, with referred symptoms into his left arm. Johnson also complained of intermittent headaches. Franklin disabled him from all work and recommended against him ever going back to heavy work. He further stated that Johnson should avoid vibrational stressed and certain positional compromises of the cervical spine. He did not feel that Johnson could drive a dump truck or be a crop duster. By March 1997, *326 | gpFranklin began allowing Johnson to work on his farm in a purely supervisory role. Franklin stated that, for the future, he hoped to bring Johnson to maximum medical cure and to find work that Johnson could do, given his impairments. He felt that Johnson’s prognosis was good for pain control and returning to light duty work. However, he stated that Johnson, could expect periodic pain and would need medication from time to time.
Ronald Johnson testified that, although Jackson told him that he would probably need surgery in four or five years, he had never missed any work because of his neck problems prior to the accident. Since the accident he has not been able to drive his truck. He sold the truck about two months after the accident because he needed the money for medical bills. He testified that he enjoyed his work as a trucker and preferred driving for himself. He stated that he knew he could make more money working for a big company but that he preferred not to be gone all the time. He further testified that prior to the accident it had been his goal to become a crop duster. He had begun taking flying lessons, had passed the written exam and gotten his medical certificate. However, Dr. Franklin had recommended that he not fly. He was very disappointed to have to quit. He testified that he was looking for light duty or sedentary work. He states that although he believes he will work again, he does not believe he will ever do what he wants to again because he can’t drive a truck and he can’t fly. He testified that he has never done any work but farming and truck driving. He is now able to supervise his teenage sons in doing farm work, but he is unable to do any of the labor involved in farming. Johnson testified that he has not gone a day without pain or without taking medication since the accident. His right leg, his neck and his left arm and |2ihand still bothered him at the time of trial.
Dr. John Grimes is a professor of psychology at the University of Southwestern Louisiana and has a private practice in rehabilitation counseling. He saw Ronald Johnson for an evaluation. He reviewed Johnson’s medical records and administered a battery of tests. He concluded that Johnson did not have the background to go to Vo-Tech school or college but was a good candidate for the work force. Given the restrictions placed on him by the doctors, Grimes believed that Johnson could be employed in light duty driving, such as hot shot or courier jobs; dispatching; as a security guard; in a light janitorial position or as a cashier in a convenience store. He felt that Johnson could earn from $5.00 to $6.50 per hour.
Donald Cornwell, an economist, testified with regard to Johnson’s past lost earnings and loss of earning capacity. He defined lost earning capacity the amount you are able to earn as opposed to the amount you do earn. He stated that he reviewed Johnson’s income tax returns for 1991-1994. He further took into account the work life expectancy tables which showed that Johnson had a work life expectancy of 21.76 or to the age of 60.69 years. He further considered, however, that many people work to the age of 62 or 65. He further took into account that Johnson could have earned more as a truck driver for a large company and considered that the average truck driver’s wage in Louisiana in 1994 was $25,027.60. He calculated Johnson’s lost earning capacity from the date of the accident to the date of the trial was $43,798.30. He also calculated the future loss of earning capacity discounted for interest to be earned on the lump sum award and the projected growth rate in average earnings by truck drivers (5.644%) over the next 20 years. He found that | ^Johnson would lose $287,311.64 if employed at the rate of $5.15 per hour beginning one year after the trial until the age of 60.69 years and $342,091.27 to the age of 65. If employed at a rate of $6.50 he found that Johnson would lose approximately $201,000.00.
Kenneth Boudreaux testified as an economist on behalf of the Defendants. He stated the best evidence of a person’s earning capacity was the person’s past earning. He, therefore, considered it inappropriate to consider the average earnings of others in the same field because as he said everyone is not average. He calculated Johnson’s lost earnings from the date of the accident through the date of trial at approximately $19,759.37 *327 using the two highest earning years. Averaging Johnson’s income for all four years between 1991-1994, he found the past loss to be $9,725.00. Using all four years to calculate loss of earning capacity, he found that Johnson would have no loss because minimum wage employment would yield a greater income than Johnson’s average earnings for those years.
In support of their position, the Defendants have cited the factors enumerated in Pierce, 96-92, p. 3; 688 So.2d at 1095, for determination of loss of earning capacity:
[T]he plaintiffs condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiffs employment opportunities before and after the accident....
Considering the evidence adduced at trial in light of Pierce and the speculative nature of the evidence with regard to the need for surgery absent the accident, we conclude that the reasonable men could differ as to whether the jury’s award of loss of earning capacity was an abuse of its discretion. Therefore, l^the trial court did not err in denying the Defendants’ motion for JNOV.
However, consideration of that same evidence leads to the conclusion that reasonable men would conclude that the jury’s award of general damages was unreasonably low. We further conclude that the trial judge’s award is reasonable under the circumstances and does not constitute an abuse of his discretion under the circumstances.
CONCLUSION
For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are to be paid by the Defendants.
AFFIRMED.
Woodard, J., concurs in the result.

. La.R.S. 23:1061. Principal contractors; liability
A. When any person, in this Section referred to as the "principal”, undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person, in this Section referred to as the "contractor”, for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed. The .fact that work is specialized or nonspecialized, is extraordinary construction or simple maintenance, is work that is usually done by contract or by the principal’s direct employee, or is routine or unpredictable, shall not prevent the work undertaken by the principal from being considered part of the principal’s trade, business, or occupation, regardless of whether the principal has the equipment or manpower capable of performing the work.
B. When the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor.

. See Malone & Johnson, 13 Louisiana Civil Law Treatise, §§ 74, 78 (1994); Guidry v. Gueydan Coop. Dryer, Inc. 97-874 (La.App. 3 Cir. 12/10/97); 706 So.2d 146, n. 3. Further, it appears that the various courts’ decisions to follow or not follow Lushute, 354 So.2d 179, may sometimes be result oriented. In those cases where the plaintiff seeks damages under a tort theory the courts for the most part follow Lushute. In those cases where the plaintiff is seeking worker's compensation, the courts often do not cite Lushute. In such cases, the court have, for the most part simply followed the specific provisions of La.R.S. 23:1021(6), seemingly requiring that a claimant show only that they are an independent contractor spending a substantial part of his work in manual labor and without requiring that they show that their work forms part of the principal’s trade, business or occupation. See, e.g., Riles v. Truitt Jones Construction, 648 So.2d 1296 (La.1995); Ted v. Superior Scrap Metals, 95-969 (La.App. 5 Cir. 5/15/96); 675 So.2d 1169, writ denied, 96-1566 (La.5/1/97); 693 So.2d 749; Fontenot v. Richard, 97-220 (La.App.6/4/97); 696 So.2d 176. For whatever reason, this apparent discrepancy has not been directly addressed by the supreme court or the legislature.