834 So.2d 1026 (2002)
SAFECO INSURANCE COMPANY OF AMERICA
v.
CHRYSLER CORPORATION, et al.
Michael William Mioton, et al.
v.
Chrysler Corporation, et al.
No. 01-1641.
Court of Appeal of Louisiana, Third Circuit.
July 31, 2002.
*1030 Arthur Howell Andrews, Funderburk & Andrews, Baton Rouge, LA, for Plaintiff/Appellee, Safeco Insurance Company of America.
Bradley John Gadel, Percy, Smith, Foote & Gadel, Alexandria, LA, for Plaintiff/Appellee, Michael William Mioton.
Michael M. Noonan, McGlinchey, Stafford, PLLC, New Orleans, LA, for Defendant/Appellant, DaimlerChrysler Corporation, Southern Chrysler Plymouth, Inc.
Court composed of MARC T. AMY, MICHAEL G. SULLIVAN, and GLENN B. GREMILLION, Judges.
GREMILLION, Judge.
The defendants, DaimlerChrysler Corporation and Southern Chrysler Plymouth, Inc., appeal the judgment in favor of the plaintiffs, Michael and Sue Mioton and Safeco Insurance Company of America. For the following reasons, we affirm in part, reverse in part, and remand.

FACTUAL AND PROCEDURAL BACKGROUND
In January 1998, Michael and Sue Mioton filed suit against DaimlerChrysler and Southern Chrysler claiming that their home was destroyed by a fire originating in their 1996 Plymouth Grand Voyager mini-van, manufactured by DaimlerChrysler and purchased from Southern Chrysler, that was parked in their carport. In their petition, the Miotons stated that they had a fire loss policy with Safeco, but that the policy did not cover all of the losses directly associated with and resulting from the fire. They further alleged that the van contained defects and characteristics that rendered it unreasonably dangerous in construction or composition, which existed at the time it left the defendants' control. In the alternative, they argued that the van was unreasonably dangerous in design because it deviated in a material way from DaimlerChrysler's specifications or performance standards. The Miotons further claimed that Southern Chrysler failed to properly repair the van and that they were entitled to a complete recision of the sale of the van.
In addition, Safeco filed a petition for subrogation urging that the defendants were liable jointly and in solido to it and the Miotons. In that petition, Safeco alleged that the van was unreasonably dangerous, with defects existing in construction and/or composition at the time it left DaimlerChrysler's control, and that the van deviated in a material way from DaimlerChrysler's specifications or performance standards. Safeco further alleged that Southern Chrysler failed to properly repair the van.
The Miotons' suit was eventually consolidated with Safeco's subrogation suit against the same defendants. Southern Chrysler filed a cross-claim against DaimlerChrysler urging that its "Sales and Service Agreement" with DaimlerChrysler provided that it would indemnify and hold the dealer harmless for expenses resulting from a products liability suit. The trial court granted a motion for summary judgment filed by Southern Chrysler, dismissing the plaintiffs' claims based on the Louisiana Products Liability Act and based on negligent repairs.
*1031 After a June 2000 trial, the jury returned a verdict finding that there was a defect in the manufacture of the van when it left the control of DaimlerChrysler, and that the defect was the cause of the January 1997 fire. It awarded the Mioton's the following damages:

Uninsured Home Contents $50,000.00
Uninsured Rebuilding Expenses $ 7,900.00
Loss of Mazda Truck $ 2,500.00
Auto Rental Expenses $ 907.79
Storage Expenses $ 2,672.92
Loss of Income to Linda Mioton $ 1,409.85
Loss of Income to Michael Mioton $ 3,897.00
Medical Expenses of the Miotons $ 0.00
Hardship and Inconvenience $ 0.00
Mental Anguish and Distress $ 0.00

In August 2000, a hearing was held to set expert witness fees and attorneys' fees, matters that were not put before the jury. The costs associated with expert fees were resolved at the hearing, leaving the trial court to resolve the issue of attorneys' fees in a written opinion. At issue before the trial court was whether the plaintiffs waived the right to raise the issue of redhibition at trial thereby disentitling them to recover attorneys' fees from DaimlerChrysler. In November 2000, the trial court rendered written reasons for judgment in which it found in favor of the Miotons and awarded them $40,000 in attorneys' fees and in favor of Safeco and awarded it attorneys' fees "in the amount provided in its contingency fee contract."[1]
The trial court issued its written judgment on December 8, 2000, ordering DaimlerChrysler to pay general damages in the sum of $69,287.56 to the Miotons and $249,934.07 to Safeco. It was ordered that judgment be rendered in favor of Safeco against DaimlerChrysler and Southern Chrysler in solido for $24,548.90, the purchase price of the van. Further, the trial court awarded attorneys' fees to the Miotons totaling $40,000 and to Safeco totaling $91,494, to be paid by DaimlerChrysler. Finally, the trial court set the expert witness fees.
Shortly thereafter, DaimlerChrysler appealed the ruling awarding the Miotons and Safeco attorneys' fees. The Miotons filed a motion for judgment notwithstanding the verdict (JNOV) urging that the jury erred in awarding only $50,000 for the uninsured loss of home contents claiming that the actual, stipulated, proven, and unrebutted damages totaled $66,688.10; in awarding $7,900 for the uninsured rebuilding expenses when the actual damages were $23,188.57; in failing to award medical expenses when the unrebutted evidence at trial indicated that the total expenses incurred were $11,750; and, in failing to award general damages for hardship, inconvenience, mental anguish, and distress. After a hearing in January 2001, the trial court granted the JNOV and increased the award for the uninsured home contents to $66,688.10, the uninsured rebuilding expenses to $13,300, and the medical expenses to $11,750. This judgment was signed on March 30, 2001.[2]
Thereafter, on April 6, 2001, the trial court filed amended reasons for judgment in order to address the issue of general damages pursuant to the JNOV. In its written reasons, the trial court granted that portion of the JNOV and awarded the Miotons $15,000 for mental anguish and $15,000 for hardship and inconvenience. On that same day, Southern Chrysler filed a motion to vacate and amend the JNOV urging that it was erroneous because it *1032 incorrectly cast it liable in solido with DaimlerChrysler for $274,482.97 to Safeco.
On May 15, 2001, DaimlerChrysler appealed the judgments in favor of the Miotons and Safeco that totaled $509,102.63, plus interest and costs. The order granting the appeal was signed that same day. On May 17, 2001, the trial court, on its own motion, granted a new trial on the March 30, 2001 JNOV ordering that the parties show cause on June 18, 2001, why the March 30, 2001 JNOV should not be vacated and why an amended judgment awarding general damages should not be issued.
On June 14, 2001, Southern Chrysler withdrew its motion to vacate and amend the JNOV and further dismissed its cross-claim against DaimlerChrysler. On June 15, 2001, Southern Chrysler appealed the judgments in favor of Safeco for $24,548.90 and $274,482.97 and the Miotons for $103,125.66, plus interest and costs. The order granting Southern Chrysler's appeal was signed that same day.
On June 18, 2001, the trial court, at the hearing on the motion for new trial on the JNOV, filed for record its April 6, 2001 amended reasons for judgment awarding the Miotons $30,000 in general damages and rendered and executed a final JNOV in favor of the Miotons and against DaimlerChrysler for the sum of $133,125.66; in favor of Safeco and against DaimlerChrysler for $249,934.07; in favor of Safeco and against DaimlerChrysler and Southern Chrysler for $24,548.90, for the return of the purchase price of the van; in favor of the Miotons and against DaimlerChrysler for $40,000 for attorneys' fees; and, in favor of Safeco and against DaimlerChrysler for $91,494 for attorneys' fees.
On June 27, 2001, DaimlerChrysler filed for supervisory writs to this court, which were denied because it had an adequate remedy by appeal. On July 26, 2001, DaimlerChrysler and Southern Chrysler appealed the December 8, 2000, March 30, 2001, and June 18, 2001 judgments. In December 2001, Safeco answered DaimlerChrysler's appeal requesting that DaimlerChrysler pay all costs associated with the appeal and urging that if the judgment of the trial court awarding it attorneys' fees is dismissed or otherwise modified by this court then we should award attorneys' fees based upon quantum meruit because of its contingency fee contract with counsel. On January 2, 2002, the Miotons answered the appeal filed by DaimlerChrysler requesting additional attorneys' fees for work done on appeal.
On February 4, 2002, DaimlerChrysler filed a partial exception of no right of action, urging that, pursuant to La.Code Civ.P. art. 2163, the trial court erred in granting attorneys' fees to Safeco because the jury did not find that the van contained a redhibitory defect, Safeco did not plead redhibition or request attorneys' fees in any pleading prior to the submission of the case to the jury, attorneys' fees are not recoverable via Safeco's subrogation claim, and Safeco failed to introduce any attorney fee evidence.

ISSUES
DaimlerChrysler assigns as error:
1. The trial court misapplied La.Code Evid. art. 702 and erred in excluding opinions of an independent electrical expert based on its belief that his opinions would not assist the jury and because it found the expert's testimony was not credible.
2. The trial court erred in entering judgment on a verdict finding that wiring in a parked vehicle was the cause of a fire when the only witness with knowledge of the relevant facts testified that the wiring did not carry sufficient current to cause a fire.
*1033 3. The trial court erred in permitting the plaintiffs to argue that an investigator hired by the defendant agreed with their investigators' cause and origin opinions when the undisputed evidence showed that the defendant's investigator was not hired to form any opinion about the cause of the fire.
4. The trial court erred as a matter of law in deeming admitted matters concerning insurance coverage and the investigation and payment of claims that were legal conclusions and which were not separately set forth as required by La.Code Civ.P. arts. 1466 and 1467.
5. The trial court erred in entering a JNOV increasing awards of special damages which were based on the jury's reasonable determinations concerning the credibility of the witnesses and the necessity for the expenditures for which recovery was sought.
6. The trial court erred in rendering a JNOV awarding additional general damages because at the time this judgment was rendered, the jurisdiction of the trial court had been divested by the filing of the suspensive appeals and the granting of orders of appeal to all defendants; all delays for post-trial motions had elapsed; and, there was no pleading before the trial court seeking an increase in damages.
7. The trial court erred as a matter of law in finding a redhibitory defect and in awarding damages against the manufacturer based on that finding because the evidence did not establish the elements of a redhibition claim; the jury did not find a redhibitory defect; the alleged subrogated insurer failed to plead redhibition; the pleading of redhibition by the insureds in a consolidated suit did not relieve the insurer of the pleading requirement; the insurer has no right of action for attorney fees; and, the insurer failed to present evidence of its attorneys' fees.
8. The trial court erred as a matter of law in permitting the alleged subrogated insurer to recover sales tax as a component of the insured's loss paid by the insurer.
Southern Chrysler assigns as error:
1. The trial court erred as a matter of law in awarding judgment against a selling dealership under a theory of redhibition, the only theory under which the seller could be liable, because the evidence did not establish the elements of a redhibition claim; the jury did not find a redhibitory defect; the plaintiffs waived their claim in redhibition by not objecting to the verdict form which omitted the claim; and, the jury's finding of a manufacturing defect under the LPLA does not permit recovery under redhibition.
2. The trial court erred in awarding the alleged subrogated insurer the purchase price of the vehicle and attorneys' fees because the insurer failed to plead redhibition; the pleading of redhibition by the insureds in a consolidated suit did not relieve the insurer of the pleading requirement; the insurer has no right of action for attorneys' fees; and the insurer failed to present evidence of its attorneys' fees.
3. The trial court erred as a matter of law in holding a good faith seller liable for consequential damages because a seller in good faith under La.Civ.Code arts. 2520 and 2545 is *1034 subject to liability only for the purchase price of the vehicle.
The Miotons assign as error:
1. In answering the appeal, that they are entitled to reasonable attorney fees for work done on appeal.
2. In the event that we determine that the JNOV issued by the trial court was improper, that the opinions of the trial court be deemed probative, as they are a correct statement of the facts contained in the record, and that the awards by the trial court in the post trial motions be adopted by us in their entirety.

EXPERT WITNESS
DaimlerChrysler argues that the trial court abused its discretion in excluding the opinions of its electrical engineering expert, George J. Mahl. La.Code Evid. art. 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
On appeal, we will not disturb the trial court's vast discretion in determining the admissibility of expert testimony unless it is clearly erroneous. See Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073.
At the close of the plaintiffs' case, Safeco objected to DaimlerChrysler calling Mahl as an expert witness, claiming that he did not qualify as an expert and that his methodology was inherently flawed. Initially, Mahl testified that he was not a licensed fire investigator. He testified that he was able to point to four photographs that led to his opinion that the fire did not start in the van. He indicated that one of the photographs showed that electrical wires were fused together in the kitchen which could have been the source of the fire. In fact, the "electrical wires" were pine straw.
Finally, Mahl went on to testify that, in his opinion, more likely than not, the van was not the source of the fire. He said that he based his opinion on things other than the photographs, such as DaimlerChrysler electrical schematics, the wiring harness, and his review of the literature.
In ruling on Mahl's qualifications, the trial court stated:
Well, he is an electrical engineer. He would be allowed to testify as an electricalelectrical engineer, but not as an expert in this case because of the issue before the jury. Because the Court would believe it would be confusing and undermining to what has already been presented. Because he is not qualified, based on just his engineering degree, as an expert as far as the origin and cause of fires are concerned.
....
Based upon that, I have no faith in your testimony. I'm not going to sabotage this case byup to this point, this jury has heard professional, expert ... testimony and advice, whether they believe it or not. I have no credibility in what you're about to say. And I don't want to transfer that to the jury.
....
... [M]y argument, and make it clear, the Court's response is based upon credibility. He could have ten Ph.D.'s in electrical engineering, and it's called credibility.
The trial court then summarized its reasons for excluding Mahl's testimony as follows:

*1035 On the basis of a misidentification of a photograph, and, also, in his testimony, as the record will reflect (I don't want to state it, because I may misstate it.), his limited experience for which he is called here in the particular and specific issue that's before this Court.
....
He may have worked as anas an engineer, as being an electrical engineer, but he does not qualify as an expert as far as the origin and cause of fires are concerned, and, specifically, in this particular case, since that is the central issue upon which liability may or may not lie.
DaimlerChrysler argues that expert testimony by an electrical engineer would have been relevant and helpful to the jury. It suggests that a mistake (misidentification of the photograph) goes to the weight to be accorded the expert's opinion, not admissibility, and that it is the jury's province to gauge a witness's credibility. Furthermore, DaimlerChrysler claims that the error in excluding Mahl's testimony was not harmless because the defendants were entitled to present an independent expert on the central liability issue, and that we should remand the case for retrial based on this issue. We disagree.
We have adopted the standards set forth by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which regulate the admission of "scientific" testimony. In that case, the Supreme Court stated that the gatekeeping function of the trial court requires it to assess, among other things, the "reliability" of the methodology or formulation upon which the expert's opinion is based. The reliability of a non-scientist expert's testimony, when it is not formulated on a scientific research, is still judged using the Daubert standard. The Supreme Court has recognized such in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). We have also recognized such in Darbonne v. Wal-Mart Stores, Inc., 00-551 (La.App. 3 Cir. 11/2/00), 774 So.2d 1022. Thus, the trial court's gatekeeping obligation applies to testimony based on "technical" and "specialized" knowledge. Id. In Kumho, 526 U.S. at 141-42, 119 S.Ct. at 1171, the Supreme Court stated:
[T]he test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.
The trial court's inquiry must be tied to the facts of the particular case. Id. The abuse of discretion standard applies to the trial court's ultimate conclusion as to whether to exclude expert witness testimony and to the trial court's decisions as to how to determine reliability. Id.
In this particular case, the proposed expert testified that he identified four photographs as representative of other causes of the fire. He proclaimed that one such cause was an electrical short emanating from the kitchen. However, he identified pine straw in the photograph as the electrical component that shorted out. Clearly, the factual basis for Mahl's testimony, that the fire did not originate in the van, was called into question. While it is true that it is the trial court's prerogative to allow the jury to weigh the witness's testimony, in light of a misidentification of electrical wiring, such a blatant misidentification, which the defendants refer to as a "mistake," does not only address the credibility of the witness, but the very foundation for the testimony his proponent seeks *1036 to enter into evidence. Since the cause and origin of the fire is the central issue of this case, we cannot say the trial court abused it vast discretion in excluding this witness as unreliable.
Moreover, DaimlerChrysler's argument that it was prejudiced because it was only able to provide one expert witness is without merit. DaimlerChrysler had more than three years to secure an expert witness on its behalf. We note that Mr. Mahl was employed by it a mere thirty days before trial. Additionally, our review of his proffered testimony indicates that Mahl became aware of the wiring harness in the van two days before his testimony was given and that he had not seen it until the day of his testimony. Further, he had never been to the scene of the fire or viewed the van in question. When reviewing the trial court's decision in the light of the totality of the evidence, we find further reason to hold that the trial court did not abuse its vast discretion. This assignment of error is without merit.

PRIVATE INVESTIGATOR
DaimlerChrysler next argues that the trial court erred in allowing the Miotons to argue that its investigator agreed with the plaintiff's experts when the evidence shows that its investigator was not hired to form an opinion regarding the cause and origin of the fire. The investigator hired by DaimlerChrysler to investigate the scene, Eugene Ferris, did not testify at trial. Robert Banta, a senior engineer employed by DaimlerChrysler for thirty three years and an expert in motor vehicle fire investigation, stated that Ferris was not an expert, but DaimlerChrysler, in its answers to interrogatories, identified him as an expert witness. George Casellas, an expert in electrical engineering, origin and fire cause determination, forensic engineering, explosion investigation, and a certified fire investigator, testified at trial that Ferris agreed with him as to the cause of the fire. In closing arguments, the Miotons implied that Ferris' absence at trial was clearly because his testimony would be contrary to DaimlerChrysler's position that the fire did not originate in the van. The defendants, in closing arguments, stated that Ferris was not at trial because he was on a family vacation. Nonetheless, his deposition was admitted into evidence for the jury to peruse.
DaimlerChrysler argues that "[a] pervasive theme of plaintiffs and Safeco's causation theory was their unfounded arguments about the `opinion' of a private investigator, Eugene Ferris." We disagree. The plaintiff's mentioning of Ferris was negligible at best, and the jury had his entire deposition to review to determine for themselves whether he agreed with the plaintiff's experts. Furthermore, the issue of whether Ferris was an "expert" or an "investigator" is of little moment. Banta testified that Ferris was not an expert. Also, from the deposition admitted into evidence, the jury could properly assess Ferris' qualifications and accord whatever weight it deemed appropriate to his opinions. Finally, even if we determine that all comments pertaining to Ferris and his opinion should have been stricken, there was still significant evidence to support the jury's finding, and we are unable to find manifest error on its part. Therefore, this assignment of error is without merit.

ADMITTED MATTERS
DaimlerChrysler argues that the trial court erred in determining that Safeco had paid $274,482.97 to the Miotons and that the amount paid was reasonable and proper and paid by Safeco based upon a good faith determination of the losses sustained. *1037 DaimlerChrysler further argues that the trial court erred in rejecting its arguments that Safeco's requests for admissions concerning its damages and their reasonableness are in violation La.Code Civ.P. arts. 1466 and 1467. The judgment on the Motion to Determine Sufficiency of Objections to Request for Admission specifically stated the facts deemed admitted by DaimlerChrysler:
1. That Safeco had in full force and effect two separate policies of insurance, one providing coverage to Linda and Michael Mioton for the loss by fire of their house and a second policy providing coverage to them for the loss by fire of their 1996 Plymouth Voyager minivan, the written policies themselves being the best evidence of their contents and coverages.
2. That Safeco paid a total of $274,482.97 to Linda and Michael Mioton in payment of the covered losses they sustained in the fire of January 21, 1997.
3. That the amount paid was reasonable and proper and paid by Safeco based upon a good faith determination of the losses sustained in the fire and was acceptable to Linda and Michael Mioton.
La.Code Civ.P. art. 1466 states:
A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Articles 1422 through 1425 set forth in the request or of the truth of any relevant matters of fact, including the genuineness of any documents described in the request. Copies of documents shall be served with the request unless they have been or are otherwise furnished or made available for inspection and copying. The request may, without leave of court, be served upon the plaintiff after commencement of the action and upon any other party with or after service of the petition upon that party.
La.Code Civ.P. art. 1467 states in pertinent part:
Each matter of which an admission is requested shall be separately set forth. The matter is admitted unless, within fifteen days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection.... If objection is made, the reasons therefor shall be stated. The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify his answer or deny only a part of the matter of which an admission is requested, he shall specify so much of it as is true and qualify or deny the remainder.
....
The party who has requested the admissions may move to determine the sufficiency of the answers or objections. Unless the court determines that an objection is justified, it shall order that an answer be served. If the court determines than an answer does not comply with the requirements of this rule, it may order either that the matter is admitted or that an amended answer be served. The court may, in lieu of these orders, determine that final disposition of the request be made at a pretrial conference or at a designated time prior to trial.
The purpose of Article 1466 is "to relieve parties of the expense of proving *1038 that which is not seriously disputed and to relieve the courts from taking needless time to hear such matters." Powell v. Department of Highways, 383 So.2d 425, 430 (La.App. 4 Cir.), writ denied, 389 So.2d 1129 (La.1980) (emphasis added). The purpose of Article 1467 is to require the admission of facts which are not to be disputed at trial in order "to eliminate the time, trouble and expenses of proving uncontroverted facts." New Orleans Public Service, Inc. v. Checker Cab Co., 332 So.2d 489, 490 (La.App. 4 Cir.1976).
First, DaimlerChrysler argues that Article 1466 allows the admission of only uncontroverted facts, and that the issue of Safeco's policy coverage and payments supporting their claim for subrogation were controverted legal issues. We disagree. Second, DaimlerChrysler argues that Safeco's "multiple issue admission requests" violated Article 1467 because each matter must have been separately set forth in order to determine whether the payments made were "reasonable" and "proper" and whether Safeco made a "reasonable investigation" and a "reasonable adjustment," and it urges that Safeco bore the burden of proving these matters at trial. Again, we disagree.
DaimlerChrysler argues that the issues admitted were controverted and were not proved sufficiently nor were they proved to be reasonable. At issue are those matters routinely admitted in lawsuits where insurance coverage is not the central issue, such as whether or not the Miotons were covered under a Safeco policy, the amount that Safeco paid to the Miotons under the policy, the extent of the damage to the Mioton's home relative to the policy limits, and whether the payment made by Safeco to the Miotons was reasonable and proper to name a few. This is precisely the sort of situation in which these issues are not being seriously disputed by the parties. Copies of the insurance policy including its most minute details, a twenty-five page summary of the claims that were submitted to Safeco, copies of every check issued by Safeco to the Miotons, and hundreds of pages of detailed claims valuation reports were provided to DaimlerChrysler and were introduced at trial.
As argued by Safeco, perhaps DaimlerChrysler intended to cross-examine Safeco's adjusters regarding every item of reimbursement of which there are thousands, including the reasonable and proper cost of every individual item of clothing, dishware, household accessory, and bottle of aspirin lost in the fire. We agree that this would be a huge waste of the trial court's time and would be inefficiency at its best. Moreover, the Safeco adjuster who handled the claim, Wes Staley, testified as to the tedious claims and reimbursement process that he and the Miotons undertook in satisfying the policy limits. DaimlerChrysler did not take the opportunity to cross examine the various witnesses which it should have done if it had doubts about the procedure Safeco used to pay out the Miotons' claim. We are satisfied that Safeco would not have paid out such a substantial sum to persons whom were not covered under their policy and who did not prove what was owed to them for their losses. While the request for admission of facts and judgment thereon could have more elaborately set forth the specifics of the policy as urged by DaimlerChrysler, we find that the evidence submitted at trial was sufficient to satisfy that these facts were not seriously disputed and that DaimlerChrysler did not avail itself of the opportunity it had at trial to disprove any facts it contested. Thus, we find no serious dispute that these matters should have been admitted, and find this assignment of error to be without merit.

*1039 REDHIBITION AND THE LOUISIANA PRODUCTS LIABILITY ACT
The central issue in this case was whether the fire originated in the van. On appeal, DaimlerChrysler and Southern Chrysler both urge that the jury committed manifest error in finding that a defect in the van was the cause of the fire. They also urge that the trial court erred in finding a redhibitory defect and in awarding damages based on that finding because the jury did not find a redhibitory defect, and that the plaintiffs waived their claim in redhibition by failing to object to the verdict form which omitted the claim. DaimlerChrysler and Southern Chrysler further argue that the jury's finding of a manufacturing defect under the LPLA does not permit recovery under redhibition. They also argue that Safeco failed to plead redhibition and the Miotons' pleading in redhibition did not relieve Safeco of its pleading requirement, therefore, it had no right of action for attorneys' fees. Finally, they claim that Safeco failed to present evidence of its attorneys' fees, and that as a good faith seller, Southern Chrysler is not liable for consequential damages.
Finding of facts by the jury will not be disturbed in the absence of manifest error or unless it is clearly wrong. See Rosell v. ESCO, 549 So.2d 840 (La.1989).
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
Id. at 844.
Though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id. "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State, Through DOTD, 617 So.2d 880, 883 (La.1993). "The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." Id. at 882.
Questions one and two of the jury verdict form read as follows:
(1) Was there a defect in the manufacture of the Mioton vehicle when it left the control of the DaimlerChrysler Corporation?
Yes_____ No _____
(2) Was that defect the cause of the January 21, 1997 fire?
Yes_____ No _____
The jury placed check marks next to "yes" in response to both of these questions. Thus, the jury found that the fire was caused by defects in the van and that it originated there. We have reviewed the extensive evidence in this case and we cannot say that the jury was manifestly erroneous in finding that the cause of the fire originated in the van.
Jim Reichman, an attorney and neighbor of the Miotons, stated that, although he knew the Miotons, they did not socialize together and he had never been in their home before. He stated that, on the night of the fire, at around midnight, he heard an explosion and in less than a minute proceeded outside to see a fire at the Miotons home in the area of their garage. He went on to say that he first saw "that there was a fire coming from the front portion of the Mioton's van, and that column was extending straight up." He testified *1040 that he could see the rear and driver's side of the van from his vantage point and that the fire was coming from the front third of the van. He further stated that there was no doubt in his mind that the column of fire was coming from the van.
Nova Spurlin, a registered nurse who lived directly across the street from the Miotons, stated that she had never met them before the date of the fire. She testified that, on the night of the fire, she was awoken by her dog who was "having a fit" around 1:00 a.m. to 1:30 a.m. She said she got up to see that the Miotons' residence was on fire. She stated that she immediately dialed 911 and then went outside to give assistance in getting the Miotons out of the house. She testified that she saw "fire rolling out, up to the eaves of the house in the front, over the van." She stated that there were no other parts of the house on fire at that time and that the fire was coming from the top of the van.
Glenn Lacour, vice president of a local bank who lived two doors down from the Miotons, said that he did not socialize with them and had never been in their home. He stated that, on the night of the fire, he heard a loud explosion between 12:00 a.m. and 12:30 a.m. and went outside to discover the Miotons' house on fire. He testified that he was worried about his house catching on fire because the wind was blowing cinders across the roof of his house and the neighbor situated between himself and the Miotons. He said that he got out his water hose and started wetting down his and his neighbor's roof for approximately an hour and a half. He testified that earlier that night, at around 11:00 p.m., he had gone outside to bring his garbage cart to the street and that he had recalled a faint smell of burning plastic, but that, after looking around for a minute and not seeing anything, he went inside and went to bed. He stated that, when he saw the fire, the carport, kitchen area, and front part of the house were engulfed in flames.
H.B. "Beau" Cunningham, a retired loan officer and another neighbor of the Miotons, testified that in the five or six years he has lived in the subdivision he had been inside their home only twice. He said that they did not socialize but made small comments to each other about their yards and such. He stated that the night of the fire he was awoken by the orange light of the fire which he could see through the blinds in his bedroom. He said that he got up and went outside and the first thing he saw was fire inside the van that extended up to the carport area, and that at that time, no other part of the house was on fire.
Louise Ingo, who lived right next door to the Miotons at the time of the fire, testified that she was friendly with them. She stated that, at around 12:00 a.m. to 12:30 a.m., she was awoken by Erica's cries and screams for help and that when she looked out the window she saw that the Miotons' house was on fire. She said that she called the fire department. She testified that she heard explosions that sounded like glass windows bursting and noticed there was no glass on the passenger sides of the van and another vehicle parked in the Miotons' driveway. She claimed that the fire was coming from the carport and the front portion of the van that was parked underneath the carport.
Linda Mioton, an accountant, testified that her family had not experienced any electrical problems at home whatsoever prior to the fire. She stated that she purchased the van new in October 1996, and that she had brought it in for repairs several times since the purchase because the front dashboard panel where the AC buttons and cassette tape player were located would get hot to the touch. She also stated that she brought the van in for *1041 repairs in November 1996 because the driver's side rear sliding door would not lock properly and the automatic lock would not engage. She testified that the repairs were made, but that the dashboard was still warm to the touch.
William Bolen, a Pineville firefighter and expert in the cause and origin of fires and fire investigation,[3] testified that this was the first case he had investigated involving a vehicle fire. He stated that he was first contacted the morning after the fire by the Holiday Village Volunteer Fire Department to help determine what started the fire. He said that, upon his arrival, he first spoke with Raymond Ewing of the Fire Department. He testified that Ewing was driving one of the trucks for the fire department on the evening of the fire and that Ewing informed him that, upon their arrival at the fire, the van was fully involved and the carport area was becoming involved in actual fire. Bolen testified as to his methodology of investigating a fire and stated that the carport area received the most damage in this fire. He stated that he checks electrical outlets to rule out electrical problems within the house and that electrical problems within the house were ruled out in this case. He further testified that arson was ruled out as a cause of this fire.
Bolen went on to say that the fire patterns derived from the remains of the fire indicated that it did not start in the residence. He testified that it was his opinion that the interior driver compartment of the van was where the fire originated. He said:
The most burned areas of this structure appeared, to me, to be the carport wall that separates the carport wall from the hallway. That particular wall appeared to be burned more severely and more damaged than any other place in the structure or outside of the structure. That wall had absolutely no reason whatever to spontaneously combust and had no electrical outlets on that wall to produce electricity, which could ignite a fire in that area. Therefore, looking at that particular evidence, the fire had to have started near that wall to burn that wall as low as it did. So thatthat's what brought me to look at the van itself.
He went on to say that, even though his investigation was concluded when he determined it was not arson and that it was accidental, there was further evidence which suggested that the fire originated in the van. That evidence included the numerous locations in the driver's side of the van where significant arcing and fusing tactics, along with beading of wires, occurred. He went on to testify that, although he believed the fire started within the van, he disagreed with the conclusion that it started in the door locks on the driver's side door.
Robert Green, a fire origin and cause investigator for Unified Investigations & Sciences, Inc., testified that he has investigated in excess of five hundred fires. He stated that he arrived at the Mioton residence six days after the fire. He described to the jury, through the use of photographic evidence, the pattern of fire damage he observed in the house and its indications that the fire originated in the carport area. He also testified that he ruled out that the fire had originated within the home after conducting numerous checks. He further stated that he checked all electrical sources within the area of the *1042 carport and ruled them out as sources of the ignition. He determined that the greatest heat source was in the front driver's section of the van and that there was evidence of electrical activity in that area. Green testified that, at this point, he contacted Chrysler in order for them to send out an expert to determine if the fire had originated in the van and that he purposely did not disturb anything on or in the van. He said that he was contacted on January 30, 1997, by Ferris, an electrical engineer, who was retained by Chrysler to look at the van. Green also retained the services of Casellas, an electrical engineer with his company, to investigate the van. He said that all three of them went and investigated the scene together. Green ultimately concluded that the fire originated in the driver's section of the passenger compartment of the vehicle in the areas of the dash and driver's side door. Green further testified that Ferris agreed with him and Casellas that the fire had originated in the van.
Casellas testified that he has investigated around fifteen hundred fires. He stated that he was retained to evaluate the van after Green notified him that he felt that the fire had originated in the van. He said that he agreed with Green's determination that the fire originated in the van. Casellas claimed that "[t]he fire definitely originated in the van, and the cause of the fire was an electrical fault in the wire harness for the power door locks." He stated that power door locks remain energized even when the vehicle is an off position and that any time an energized circuit is present there is a potential for a fault or short of some kind. He testified that a fault occurred which heated the plastic around it causing it to ignite. He stated that it began as a low intensity fire beginning with smoke that intensified as air entered the vehicle and spread from the van into the house. Casellas went on to state that, more probably than not, the conditions that allowed the wires to ignite existed at the time of manufacturing and were an inherent type of problem, and not one caused by anything done to the power locks by anyone, including the dealer repairs. However, he stated that it was a manufacturing defect, rather than a design defect. He described in detail the four pieces of the puzzle that led him to determine that the fire originated in the van including: eyewitness testimony that the fire started in the front portion of the van, burn patterns emanating from the van, actual place of origin in the van based on the discoloration due to a severe burning on the interior panel of the driver door, and finally, ruling out all other possible sources of fire. He stated that the wire's insulation could have gradually worn away which faulted while the van was parked for several hours, thereby igniting.
Banta testified as to the accepted methods of fire reconstruction. After reviewing the trial testimony and evaluating the burn patterns and other physical evidence, Banta concluded that the fire originated somewhere directly between the front of the van and the home. He concluded that the fire did not originate in the van. Banta testified that the greatest temperatures were found at the passenger side door and not the driver's side door as exhibited by the burn pattern. He further testified that he found numerous electrical shorts in the engine compartment which indicated that the fire originated outside of the vehicle. He stated that the wiring system in the door is energized, but that it does not have twelve volts. He went on to say that, when the key to the van is in a turned off position, the only energized portion is from the computer to the switch area, and that it is a five volt signal wire which is not capable of shorting. Accordingly, he testified that Casellas' claim that *1043 arcing occurred in the wires of the door lock system was an impossibility. He further said that the ignition of the wire insulation was an impossibility since it was a signal wire rather than a twelve volt wire. Banta testified that Chrysler built approximately 2.5 million of these minivans with the same wiring system and that there were no other reported cases of door fires. He further said that he never went to the Miotons' home to inspect the van, but that Ferris was the Chrysler representative at the scene. Finally, he also stated that he examined the van, but not until February 2000, some three years after the fire.
The defendants argue that Casellas' opinion is "based on an incorrect factual premise that destroys its validity." DaimlerChrysler argues that the opinion of Casellas, that the wire shorted, is based upon a single assumed fact that is incorrect. They claim that Casellas' opinion requires that the wire be "energized" in order to start the fire, relying on Banta's testimony that once the van has been turned off the signal wires do not carry enough current to ignite the wire insulation, and that it was undisputed that the particular wires in the wiring harness of the Chrysler van were "dead." We disagree, and find that this was a factual determination properly placed before the jury.
Moreover, based on a review of this testimony and the evidence submitted by the parties, we cannot say that the jury was manifestly erroneous in determining that a defect in the van caused the fire. There was more than ample testimony indicating that the fire's origin was in the Chrysler van. Only Banta, who had never even been to the scene and only viewed the van over three years after the accident, testified that the fire did not originate in the van. It is in the province of the factfinder to make credibility determinations, and we find no error in the jury's determination that a defect in the van caused the fire that destroyed the Miotons' home.
Although DaimlerChrysler and Southern Chrysler do not specifically argue that the jury verdict form was so inadequate as to render it an error of law, we find that their argument that the issue of redhibition was not submitted to the jury, raises that particular issue. It cannot be determined from the verdict form whether the jury found a manufacturing defect under the LPLA, a redhibitory defect, or both. Nonetheless, it remains undisputed that the jury did find that a defect in the van caused the fire. The verdict form submitted to the jury was vague and overboard and merely asked whether a defect existed. We find this verdict form was inadequate in all respects, and we cannot say with any substantial certainty whether the jury found a defect under the LPLA or under principles of redhibition or both. However, it is clear from our review of the record and the briefs submitted that all the parties to this action have assumed that the jury found a manufacturing defect pursuant to the LPLA. In Crooks v. National Union Fire Insurance Co., writs denied, 629 So.2d 391, 392 (1993), 620 So.2d 421, 424 (La.App. 3 Cir.1993) (citations omitted) we stated:
It is well settled that the trial judge has a duty to give instructions to the jury which properly reflect the applicable law in light of the pleadings and facts in each particular case. Proper jury instructions are those which fairly and reasonably point up the issues presented by the pleadings and evidence and provide correct principles of law for the jury to apply to those issues. It is also the judge's responsibility to reduce the possibility of confusing the jury.

*1044 Further, a special verdict requiring a jury to return a special written finding on each issue of fact requires adequate jury interrogatories which fairly and reasonably point out the issues and which guide the jury in reaching a verdict. If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error.
If error misled the jury, then this court must set aside the verdict and, if the record permitsif it is complete then this court must make its own findings of fact, and render a verdict. If, however, there is no error, or if the error did not induce the jury to reach an erroneous verdict, then the jury's findings and verdict are entitled to deference, and the standard of review is whether those findings were manifestly erroneousnot supported by the record.
We find no error in the trial court's instructions to the jury, which adequately covered principles of redhibition and liability under the LPLA. However, we find that the jury verdict form was erroneous in that it was overly vague and broad and did not clearly set forth the elements of liability under redhibition or the LPLA. Moreover, we do not believe that a finding of a defect under the LPLA necessarily implies that a redhibitory defect exists. Because we cannot determine if the jury's findings pertained to the LPLA, redhibition, or both, we find that the verdict form was insufficient as a matter of law in delineating two separate and distinct causes of action. Thus, we will review the record to determine if the elements of either the LPLA or redhibition or both have been satisfied. However, we will not disturb the jury's finding that a defect existed in the van at the time it left DaimlerChrysler's control, and that said defect caused the fire.
Although both parties presume that the jury found a "defect" under the LPLA, the LPLA does not even use the term "defect," as do the redhibition statutes. La. R.S. 9:2800.54 states:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer *1045 or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
Further, La.R.S. 9:2800.55 states:
A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.
The Louisiana Civil Code addresses redhibition beginning at Article 2520, which states in pertinent part:
The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
"The warranty against redhibitory defects covers only defects that exist at the time of delivery." La.Civ.Code art. 2530. "The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time." Id.
La.Civ.Code art. 2531 states:
A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.
A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition. Any contractual provision that attempts to limit, diminish or prevent such recovery by a seller against the manufacturer shall have no effect.
La.Civ.Code art. 2545 states:
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.
The remedies for a claim under the LPLA and one in redhibition are different in a number of ways. The LPLA is the exclusive remedy against a manufacturer. See La.R.S. 9:2800.52. The LPLA does not allow for the recovery of attorney's fees pursuant to La.R.S. 9:2800.53(5), while attorney's fees are recoverable from the manufacturer in a redhibition claim pursuant to Article 2545. However, in Monk v. *1046 Scott Truck & Tractor, 619 So.2d 890, 893 (La.App. 3 Cir.1993) we held:
The LPLA was never intended to eliminate redhibition as a means of recovery against a manufacturer. We hold that the Act is exclusive only for the recovery against the manufacturer for "damage" as defined by La.R.S. 9:2800.53(5). This definition is:
(5) `Damage' means all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery. `Damage' includes damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Section 3 of Chapter 6 of Title VII of Book III of the Civil Code, entitled `Of the Vices of the Thing Sold,' does not allow recovery for such damage or economic loss. Attorneys' fees are not recoverable under this Chapter. (footnote designation omitted) The thinking of scholars who have written on this subject is that "redhibition survives only for economic loss. To the extent that the damage is compensable in redhibition, it is not damage under the Act. Hence, the Act's exclusivity provision does not prevent recovery for economic loss in redhibition." Galligan, The Louisiana Products Liability Act: Making Sense of it All, 49 La.L.Rev. 629, 645 (1989). The right to sue in redhibition for economic loss still exists. Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565, 580-581 (1989). This court agrees with these observations.
Therefore, it is important that we determine whether or not a finding of liability exists under the LPLA, in redhibition, or both. Clearly, scholars have realized that in order to make sure attorney's fees are recoverable, a claimant must plead theories of both redhibition and liability under the LPLA. See Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW (1996).
We have reviewed the evidence presented and, based on the jury's finding, we hold that the van was unreasonably dangerous in construction or composition under the LPLA. We also hold that a redhibitory defect existed in the van that rendered it completely useless from the time it caught fire and was completely destroyed. Thus, both DaimlerChrysler and Southern Chrysler are liable in solido for the return of the purchase price of the van. See Media Prod. Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972). We further find that Southern Chrysler did not know of this defect and was, therefore, a seller in good faith under La.Civ.Code art. 2531. Accordingly, it cannot be held liable for attorneys' fees and we reverse the judgment casting it liable in solido with DaimlerChrysler for attorneys' fees. Additionally, DaimlerChrysler, as the manufacturer, is presumed to know of the defect and is, therefore, liable for attorneys' fees.
However, we find that DaimlerChrysler can only be liable to the Miotons for attorneys' fees because Safeco did not plead redhibition or the right to attorneys' fees and cannot now "piggy-back" onto the Miotons' pleadings. Attorneys fees are special damages that must be specifically alleged. See La.Code Civ.P. art. 861 and Smith v. Howell Indus., Inc., 579 So.2d 1236 (La.App. 3 Cir.1991). Further, Safeco cannot claim entitlement to attorneys' fees via subrogation. Thus, we affirm that portion of the judgment in favor of the Miotons in the amount of $40,000 and against DaimlerChrysler, but reverse that portion in favor of Safeco awarding it $91,494 in attorneys' fees. Additionally, *1047 we note that attorneys' fees may be awarded only:
[I]nsofar as those fees relate to the recovery of purely economic loss. This is because much of the proof of a "vice" for redhibition recovery overlaps with proof of a defective product for tort purposes. However, courts in such suits should be careful to realistically allocate recovery costs between the personal injury and economic loss portions of the claim.
Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 15-6 (1996) (citations omitted).
Thus, after reviewing the evidence, we find that the attorneys' fee of $40,000 for work done pertaining to purely economic loss, the redhibition claim, to be excessive. We, therefore, reduce that sum and award $25,000 in attorneys' fees.

JNOV
DaimlerChrysler's fifth and sixth assignments of error address the JNOVs entered into by the trial court that increased the special damage awards and awarded general damages. DaimlerChrysler argues that the JNOV awarding special damages should be reversed and that the trial court exceeded its authority and abused judicial process by rendering a sua sponte JNOV after appeals were perfected. We agree and reverse the findings of the trial court and reinstate the jury's findings.
In Love v. Lewis, 00-06, pp. 4-5 (La. App. 3 Cir. 10/12/00), 771 So.2d 220, 222, writ denied, 00-3506 (La.2/16/01), 786 So.2d 102, we stated:
La.Code Civ.P. art. 1811 provides the basis for filing a Motion for JNOV. However, Article 1811 does not set forth any specific grounds on which a trial court may set aside a verdict. Therefore, we rely on the well-settled jurisprudence that a JNOV may only be granted when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable people could not arrive at a contrary verdict on the facts at issue. Peterson v. Gibraltar Sav. & Loan, 98-1601 (La.5/18/99); 733 So.2d 1198. Additionally, "[t]he trial court may not weigh the evidence, pass on the credibility of witnesses, or substitute the reasonable inferences of the facts for those of the jury." McBride v. H. Brown Machine Shop, 98-1271, p. 3 (La. App. 3 Cir. 3/31/99); 732 So.2d 650, 652, writ denied, 99-1288 (La.7/2/99); 747 So.2d 20, quoting Webb v. Goodley, 512 So.2d 527, 530 (La.App. 3 Cir.1987). In reviewing the grant of a JNOV, an appellate court must first determine whether the trial court erred in granting the JNOV. The appellate court does this by applying the same criterial as the trial court. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La. 1991). If reasonable people could have arrived at the same verdict, given the evidence presented to the jury, then the JNOV is improper. Id.

Special Damages
The trial court increased the special damages award from $50,000 to $66,688.10 for uninsured home contents, from $7,900 to $13,300 for uninsured rebuilding expenses, and from $0 to $11,750 for medical expenses.
Linda described the arduous process of finding a temporary home and replacing everything that was lost in the fire. She testified that the unreimbursed expenses that insurance did not cover included $66,688.10 for home contents, $23,188.57 for expenses to re-build the home, and $11,750 for medical expenses. We have thoroughly reviewed the evidence pertaining to the unreimbursed home contents, unreimbursed rebuilding costs, and the medical expenses and we cannot say that *1048 the jury was wholly unreasonable in formulating the awards it made. Reasonable people could have concluded that some of the expenses associated with the rebuilding and replacement of the home contents were inflated or that which goes beyond what DaimlerChrysler should have been held responsible. Further, the jury could have reasonably concluded that no medical expenses were incurred as a result of the fire. Thus, we find that the trial court's grant of JNOV was in error and we reinstate the jury's awards.
Rebuilding Expenses
Apparently, the trial court also did not feel that DaimlerChrysler was responsible for some of the expenses urged by the Miotons. For example, the Miotons claimed the total un-reimbursed expenses to rebuild were $23,188.57,[4] yet the trial court only increased the jury's award of $7,900 to $13,300, without explanation. Based on our review of the claimed expenses, we cannot say that the jury was unreasonable in determining that some of these expenses were excessive and beyond that which DaimlerChrysler should be held responsible. It is within the province of the trier of fact to weigh credibility and to accept or reject the testimony of any witnesses. It is only DaimlerChrysler's obligation to restore the Miotons' property to its pre-fire condition, not make improvements on it. For example, Linda testified that she did not have a wood stove in her old home but purchased one for her new home. The jury could certainly consider such testimony in making its award.
Content Replacement Expenses
Again, we cannot say that the evidence points so strongly and overwhelmingly in favor of the Miotons that the JNOV was properly granted. While it is true that the Miotons submitted detailed receipts for every purchase made totaling the $66,688.10 in unreimbursed content replacement costs, we still cannot say that the jury was unreasonable in discounting some of these expenses. Linda's testimony was still subject to a credibility determination by the jury. The Miotons make much of the fact that DaimlerChrysler did not cross-examine or refute any of the expenses. DaimlerChrysler's failure to cross-examine or produce contrary evidence does not mean that the jury must blindly credit the plaintiff's claimed damages. The jury does not leave its common sense at the door, and can use its judgment in determining whether some of these expenses went beyond replacement of the previously existing home contents. It was not unreasonable for the jury to conclude that $50,000 would adequately compensate the Miotons for unreimbursed content replacement expenses.
Medical Expenses
Linda testified as to the emotional toll the fire had on the family, but stated that no one required hospitalization or medications as a result of the fire. The jury was of the opinion that the claimed medical expenses were unassociated with the fire and were not recompensable.[5] We cannot say that this finding was wholly unreasonable based on the evidence the *1049 jury had before it. The majority of the expenses were associated with treatment for Jessica Mioton, Linda and Michael's adolescent daughter.
Dr. Sue May Liu, the Mioton children's pediatrician, testified that Jessica had been taking anti-seizure medication since 1991 several times a day and that she was immediately notified following the fire because her medications had burned and needed to be replaced. She further stated that she recommended to Linda that the family get counseling, especially regarding the loss of the family dog of eight years, Lady. For this purpose, she referred them to Dr. Rick Adams.
Dr. Adams, a clinical psychologist, testified that he first met the Mioton children on January 30, 1997. Dr. Adams stated that a history provided by the family indicated that Jessica had some pre-existing problems relating to struggling with grades and family communication. He stated that Michael had acknowledged problems with depression, difficulty sleeping, and anger over the events following the fire; however, Michael testified that he did not seek any treatment.
Dr. Adams stated that he had a few sessions with all of the family members, but the most with Jessica (fourteen sessions). He testified that both Rebecca and Erica were initially upset over the fire, but had adjusted normally and resolved their issues. Dr. Adams stated that Jessica felt guilty over failing to rescue Lady. He stated that the fire and normal adolescent issues finally culminated and that Jessica was suicidal at one point, had jumped out of a moving vehicle, had become involved in drugs, and eventually was placed in a structured day program because of her difficulties. Dr. Adams testified that he in no way attempted to attribute Jessica's particular problems to either the fire or adolescence. He felt that the fire did adversely affect Jessica, but he could not state to what extent.
In describing the fire, Linda testified that she and her three daughters were home that evening while her husband was at work. She stated that Lady did not survive the fire and that Jessica had tried to re-enter the house to rescue her, but that she had to physically restrain her from doing so. Michael, a registered nurse, testified as to the events that occurred the night of the fire and the rebuilding and claims process he and his family underwent. He agreed with the testimony provided by his wife.
Apparently the jury felt that Jessica's problems were not attributable to the fire and that the alleged injuries suffered by the rest of the Mioton family were not of such a substantial nature that therapy was required. Again, we cannot say that this finding was wholly unreasonable. It was undisputed that there were no physical injuries and sufficient evidence was presented for the jury to conclude that the claimed medical expenses were either unnecessary or unattributable to the fire. Therefore, we find the trial court's award to be manifestly erroneous and reinstate the jury's award.
General Damages
DaimlerChrysler argues that the trial court did not have jurisdiction when it later amended its March 30, 2001 JNOV to award general damages totaling $30,000 as appeals had already been perfected to this court. The Miotons argue that the trial court was within its authority to correct its earlier ruling and that it was simply correcting its oversight. We disagree and find that the trial court's subsequent judgment awarding general damages totaling $30,000 was without effect as the trial court had lost jurisdiction at that time because appeals had been perfected.
La.Code Civ.P. art. 2088 states:

*1050 The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal or on the granting of the order of appeal, in the case of a devolutive appeal. Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal[.]
The issue of whether or not general damages should be awarded is a matter reviewable on appeal. Following the March 30, 2001 JNOV, the trial court filed into the record of these proceedings on April 6, 2001, an "Amended Reasons for Judgment" wherein it awarded $30,000 in general damages to the Miotons. Appeals were perfected by DaimlerChrysler on May 15, 2001, and by Southern Chrysler on June 15, 2001, before the trial court's June 18, 2001 judgment awarding the general damages. While we note the trial court ordered the June 18, 2001 hearing on May 17, 2001, by granting the appeals prior to that hearing, it divested itself of jurisdiction to render the judgment. La. Code Civ.P. art.2088. Thus, the trial court had no authority to modify the March 30, 2001 JNOV in order to award additional damages because the judgment was appealed before the June 18, 2001 judgment was rendered. Therefore, the June 18, 2001 judgment is void for lack of jurisdiction. Accordingly, the March 30, 2001 judgment is the final judgment from which appeals could be taken. Because that judgment did not address general damages, the jury's award of $0 for general damages was in effect. Further, this issue is not before us because the Miotons did not appeal this judgment.
Finally, the trial court's ex propria motu motion of May 17, 2001, was without effect. While the trial court may, on its own motion, grant a new trial on any or all issues under La.Code Civ.P. art. 1971, it must do so under the seven day time restraints imposed under La.Code Civ.P. art. 1974. Since more than seven days had passed since the March 30, 2001 JNOV, the trial court could not grant a new trial. See Langston v. Willis, 177 So.2d 620 (La.App. 4 Cir.1965); Robinson v. T. Smith and Son, Inc., 148 So.2d 477 (La.App. 4 Cir.1963). Therefore, the December 8, 2000 judgment, as it pertains to the award of general damages, is reinstated and is a final and non-appealable judgment as all time delays have passed for appeal.

SALES TAX
Finally, DaimlerChrysler and Southern Chrysler urge that the trial court erred as a matter of law in permitting Safeco to recover sales tax as a component of the Miotons's loss paid by them. We agree. A subrogated insurer may not recover reimbursement from an alleged tortfeasor for sales tax it paid to its insured. State Farm Mut. Auto. Ins. Co. v. Berthelot, 98-1011 (La.4/13/99), 732 So.2d 1230. Therefore, we remand this case to the trial court for a determination of the sales tax that was paid by the Miotons and order that Safeco's judgment be reduced by that amount.

WORK DONE ON APPEAL
The Miotons, in their answer, request attorney's fees for work done on appeal. Although most of the work done on appeal was related to issues other than economic losses, some work was expended on that issue. Accordingly, we award $2,000 for attorneys' fees on appeal.

CONCLUSION
We find that the granting of the JNOV by the trial court was erroneous and reverse *1051 the award for special damages and general damages made in the JNOVs and restore those made by the jury. We further find that the Miotons had causes of action under the LPLA and in redhibition and, accordingly, we award them damages for the return of the purchase price of the van less the sales taxes and attorneys' fees in the amount of $25,000, together with an additional $2,000 for work done on appeal. This matter is remanded to the trial court to determine the sales tax attributed to the Miotons' special damages. Cost of this appeal shall be divided equally between DaimlerChrysler, Southern Chrysler, and the Miotons.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
NOTES
[1] The trial court held that because the plaintiffs never alleged that Southern knew that the van had a defect or that it failed to declare a defect in the vehicle, it was exempt from paying attorneys' fees and expert witness fees.
[2] The March 30, 2001 judgment awards the Miotons the sum of $103,125.66. We cannot determine what constitutes this amount as $66,688.10 + $13,300 + $11,750 = $91,738.10.
[3] This was the first case in which Bolen has been tendered as an expert witness as to fire cause and origin.
[4] This sum includes $1,800 for tree removal, $1,100 for soil testing, $6,590 for an architect, $75 for a tree consultant, $1,221.57 for the purchase and installation of a stove, $12,152 for landscaping, and $250 for the deductible.
[5] The medical expenses consist of: $2,350 for services provided by Dr. Adams, $1,130 for services provided to Jessica while at Crossroads by Dr. Goodin, $580 for services provided to Jessica while at Crossroads by Dr. Parker, $180 for services provided to Jessica while at Crossroads by Dr. Litwin, and $7,510 for hospital expenses associated with Jessica's treatment at Crossroads Regional.